OPINIONS OF THE JUSTICES TO THE HOUSE OF
REPRESENTATIVES.

*Stadium. Arena. Constitutional Law*, "Home Rule Amendment," Mu-
nicipalities, Equal protection of laws, Obligation of contracts, Public
purpose, Delegation of powers, Eminent domain, Taxation, Due process
of law, Borrowing by Commonwealth, Stadium, Arena. *Massachu-
setts Turnpike Authority. Municipal Corporations*, "Home rule."
*Commonwealth*, Borrowing. *Boston.*

The General Court is not precluded by the grant of the limited power "to
act in relation to cities and towns" in § 8 of art. 89 of the Amend-
ments to the Massachusetts Constitution from acting on matters of
State, regional or general concern, even though such action may have
special effect upon one or more individual cities or towns; however,
where the primary purpose of a major and severable portion of a bill,
otherwise enacted for State, regional or general purposes, is to legis-
late "with respect to . . . [the] local government," or "local mat-
ters," of a particular city or town, it may be necessary that in the par-
ticular circumstances the severable portion of the bill comply with
§ 8 of art. 89. [787–788]
Proposed legislation for the construction of a multi-purpose stadium in
Boston, a third vehicular tunnel under Boston harbor, a Worcester
toll road, and an arena near the stadium would have Statewide, re-
gional and general objectives, would promote the economic develop-
ment of the Commonwealth, could be enacted in most aspects under
the general legislative powers in Part II, c. 1, § 1, art. 4, of the Massa-
chusetts Constitution, and would not constitute action "in relation
to cities and towns" under § 8 of art. 89 of the Amendments. [788]
The General Court, in enacting a special law relating to a municipality
pursuant to a petition of the municipality, may, under § 8 (1) of
art. 89 of the Amendments to the Massachusetts Constitution, rea-
sonably vary the form and substance of the legislation within the
scope of the general public objectives of the petition, unless the legis-
lation sought is strictly limited by the municipality. [791]
A pending legislative bill for the financing, construction, and operation
by the Massachusetts Turnpike Authority of a public facilities system
consisting of projects for a multi-purpose stadium complex in Boston,
a third vehicular tunnel under Boston harbor, a Worcester toll road,
and an arena near the stadium, empowering the authority to deal
with each project separately, and providing that a limited guaranty
by the city of Boston of payment of interest on certain bonds of the
authority would terminate when any project other than the stadium
complex and the third tunnel should be included in the system, con-

tained provisions substantially conforming to the provisions of a request for a stadium complex and a third tunnel set forth in an order adopted by the Boston City Council and approved by the mayor, and was not constitutionally vitiated by the inclusion in the bill of the toll road and arena projects; upon the filing by the city of Boston of an appropriate petition for enactment of a special law with respect to the stadium complex and the third tunnel, the pending bill could not be considered to violate § 8 of art. 89 of the Amendments to the Massachusetts Constitution. [791–792]

A proposal in a pending legislative bill that the Massachusetts Turnpike Authority should not fix or charge tolls for the use of the two tunnels then existing under Boston harbor and a third tunnel under the harbor, the construction of which the legislation would authorize, by any vehicle customarily garaged in East Boston which would be higher than the tolls then in force for the two existing tunnels until bonds to be issued to finance the third tunnel and a stadium in Boston should be retired was not shown to create a reasonable classification of vehicles customarily garaged in East Boston, as compared with vehicles customarily garaged elsewhere, or to be otherwise than arbitrary, discriminatory, and capricious. [792–793] KIRK, J., dissenting.

In legislation proposed in 1969 in connection with the financing, construction and operation of a third vehicular tunnel under Boston harbor by the Massachusetts Turnpike Authority, a provision that the tolls then in effect for the two existing tunnels under the harbor should not be increased prior to January 1, 1976, would not be within the scope of action a legislature may take in modifying a prior State authorized obligation, and, in contravention of art. 1, § 10, of the Constitution of the United States, would violate the authority's contract with holders of outstanding tunnel revenue bonds issued to finance the two existing tunnels pursuant to a 1958 statute and a 1959 tunnel revenue bond trust agreement containing provisions, intended for the bondholders' protection, for revision of tunnel tolls in accordance with stated standards clearly designed to maintain tunnel revenues sufficient to meet the authority's obligations.     [793–795]

Legislation authorizing the financing, construction, and operation by the Massachusetts Turnpike Authority, with public funds, of a large multi-purpose stadium and an arena for public activities and events, conventions, professional and amateur athletic events, and other large gatherings would be for a public purpose if the expenditure of the public funds, the extension of public privileges, powers, and exemptions to the authority, and the use, rental, and operation of the projects were adequately governed by appropriate standards and principles set out in the legislation in order to protect all aspects of the public interest and to guard against improper diversion of public funds and privileges for the benefit of private enterprises operated for profit. [795, 796–797]

A pending legislative bill for the financing, construction, and operation by the Massachusetts Turnpike Authority of a "multi-purpose" stadium

complex "to provide facilities" for many listed types of civic, educational, athletic, and other activities, and of an arena nearby with facilities for activities of a similar character, failed to provide clear guidance and suitable standards as to the principles to be applied by the authority in determining basic policies for such projects, as to the relative weight to be given to various statutory objectives, or as to the particular aspects of the public interest to be protected, or any clear provision for review of compliance by the authority with appropriate standards; and, as set forth in the bill, the stadium complex and arena projects would not be for a public purpose, and there would be an unconstitutional delegation of powers to the authority. [797–799]

Under legislation setting forth principles, standards, and safeguards adequate to ensure that a multi-purpose stadium complex and an arena nearby to be financed, constructed and operated by the Massachusetts Turnpike Authority pursuant thereto would be a project for a public purpose, the authority could issue bonds to pay the cost thereof, could engage in activities and functions auxiliary and incidental to the principal activities indicated in the legislation, could negotiate and execute leases and concessions to private enterprises operated for profit, and could be granted both power to take land by eminent domain and tax exemption. [799–800]

On the facts before the Justices upon a general question propounded by a branch of the General Court, no respect was perceived in which the city of Boston would be deprived of its property without due process of law by enactment of legislation authorizing or requiring it to enter into a limited guaranty of the payment of interest on certain bonds to be issued by the Massachusetts Turnpike Authority in aid of projects to be carried out by it within Boston and largely for Boston's benefit. [801]

Under a pending legislative bill authorizing the financing, construction, and operation by the Massachusetts Turnpike Authority of a public facilities system, including projects in the city of Boston, and providing that revenue bonds issued by the authority should "not constitute a debt of" the Commonwealth, that the authority might agree with bondholders that there would be placed at the authority's disposal future revenues which would otherwise go to the Commonwealth, but not obligating the Commonwealth to pay the bonds, and requiring the city of Boston to enter into a limited guaranty of payment of interest on the bonds, but not obligating the Commonwealth to become liable on the guaranty, the Commonwealth itself would not, in the circumstances set forth in the bill, incur any debt or guaranty obligation or engage in any borrowing which would require a two-thirds vote of each house of the General Court under § 3 of art. 62 of the Amendments to the Massachusetts Constitution. [801–802]

On August 14, 1969, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit these answers to the questions in an order adopted by the House of Representatives on July 16, 1969, and transmitted to us on July 23. The order recites the pendency before the General Court of a bill, House No. 5486, a copy of which and a copy of an earlier draft of the bill, Senate No. 1033, covering much the same subject matter, are transmitted with the order. House No. 5486 is entitled "An Act providing for the financing, construction, maintenance, repair and operation by the Massachusetts Turnpike Authority of certain public facilities consisting of a stadium complex, a third vehicular tunnel, the Worcester toll road and an arena."

House No. 5486 has more than twenty-eight printed pages. The order contains recitals to which we now refer. The second of these states that the city council of Boston adopted an order, approved by the mayor, that "a petition to the general court, accompanied by a bill for a special law relating to . . . Boston . . . hereby is . . . approved under clause (1) of section 8 of article 2, as amended, of the Amendments [as appearing in art. 89 of the Amendments] to the Constitution of the Commonwealth of Massachusetts." A copy of the city council order is set out in Appendix A.

The order requesting our opinion further recites, "No bill for a special law was filed with the . . . [city council] Order but the General Court has been informed . . . that it was the intention of said City Council and Mayor to approve a new draft of said Senate, No. 1033 (House, No. 5486) which would combine the provisions of that Bill with the additional provisions contained in the Order of said city insofar as any such additional provisions are constitutional"; and that grave doubt exists as to the constitutionality of House No. 5486 if enacted.

The questions present novel and difficult issues under art. 89 and other important constitutional problems. Counsel for the Massachusetts Turnpike Authority (the Authority), at the direction of its chairman, requested and obtained leave to file a brief as an amicus curiae. A comprehensive brief was filed. We invited briefs from other interested persons to be filed by August 13. In response other briefs were filed by the Attorney General and by the corporation counsel of the city of Boston.

Various provisions of House No. 5486 we now summarize. Others are mentioned in connection with our answers below.

Section 1 of House No. 5486 recites that "there exists in the commonwealth an acute . . . need for a large multi-purpose stadium, open and available to . . . citizens . . . in large number, for the purpose of providing . . . facilities for public activities . . . such as political and patriotic rallies, public exercises, conventions and meetings of public officials, organizations protective of the rights of working men and women, and . . . groups dedicated to civic and social betterment . . . forums for educational addresses . . . conventions of educators and student organizations . . . concerts, theatrical exhibitions and other cultural . . . and recreational activities, including shows, expositions and professional and amateur athletic events"; that "the existence of a suitable gathering place for large numbers of persons will contribute substantially to the public interest"; that "there presently exists no stadium or equivalent facility in the commonwealth capable of satisfying the above needs"; that "there is . . . urgent need to finance and construct under the Boston Harbor a third tunnel for vehicular traffic"; that "there is . . . urgent need for the . . . Worcester toll road"; that "there exists in the commonwealth . . . critical need for an arena, providing indoor facilities for public activities and events in . . . Boston"; and that "the public facilities . . . authorized . . . under this act will promote the economic development of the com-

monwealth and enhance the prosperity, health, culture and welfare of its inhabitants." Later in § 1, it is stated that the "purposes for which such facilities and projects shall be provided are ... declared to be public purposes."

Section 2, among other definitions, in subsection (b) defines "project" as "any one or all of the following three public facilities, or any combination thereof . . . (1) a stadium complex consisting of a multi-purpose . . . stadium [with various related facilities] . . . and a third tunnel for vehicular traffic . . . under Boston harbor . . . (2) the Worcester toll road [a north-south road from the Connecticut boundary to the New Hampshire boundary] . . . [and] (3) a closed arena . . . to be located in the general vicinity of . . . [the] stadium complex." Subsection (c) defines "public facilities system" to mean "collectively (i) any or all projects provided under this act, or any combination thereof," (ii) the Sumner tunnel and the Callahan tunnel and appurtenant facilities, constructed by the Authority under St. 1958, c. 598, after payment (or provision for payment) of the tunnel revenue bonds issued under c. 598, and "(iii) the Massachusetts Turnpike, including the Boston extension," constructed under St. 1952, c. 354, as amended, after payment (or provision for payment) of any revenue bonds issued under c. 354, as amended, "provided, however, that the Authority is authorized to provide, in any resolution authorizing . . . bonds under this act for any project, for the exclusion of such project from the public facilities system and for the payment of such bonds from the revenues derived from . . . such project and any other funds pledged therefor under this act."

Section 3 of the bill provides that bonds "issued under ... this act shall not constitute a debt of the commonwealth or of any political subdivision thereof or a pledge of the faith and credit of the commonwealth or, except as otherwise provided herein, of any such political subdivision."

Section 4 makes a grant of specified powers to the Authority. Among other things it empowers the Authority

in subsection (e) "to fix and revise from time to time and charge and collect tolls, rents, fees and other charges for the use or occupancy of or services rendered by the public facilities system or any part thereof, or any project . . . provided that no toll or charge shall be collected by the Authority (i) for the use of the Sumner" or Callahan tunnels or the third vehicular tunnel by Boston city vehicles, or (ii) for the use of the tunnels or the Worcester toll road by "funeral processions of Vietnam veterans . . . or (iii) for the use of any of said tunnels by any vehicle customarily garaged in . . . East Boston . . . which is in excess of the tolls and charges now in effect for the use and provided, further, that tolls now in effect for the said existing tunnels of the two existing tunnels . . . shall not be increased prior to January first," 1976. There appears to be confusion in lines 70 to 73 of this provision and we assume that by inadvertence the words "of the two existing tunnels" in line 71 have not been placed after the word "use" in line 70 where there appears to be some unintentional omission of language.

With "respect to the stadium complex and the arena," § 4 (c) gives the Authority broad powers of management "without regard to any . . . laws or regulations of any . . . political subdivision of the commonwealth, and, except as otherwise provided . . . to enter into operating agreements . . . lease to lessees and grant concessions with respect to the public facilities system or any project excluded from such system, and otherwise to enter into such contracts and dispose of such interest in said system as in the determination of the Authority is in the public interest, provided, however, that any agreement providing for the leasing by the Authority of any part of the public facilities system or any project shall provide for the payment of such rent therefor as in the determination of the Authority will be at least sufficient with any other funds available therefor, to enable the Authority to pay to the extent feasible the obligations that the Authority shall incur in connection

with such facilities or project leased, and provided further that the leasing of the stadium complex or the arena or the grant of any concession therein for a term of more than one year shall be subject to approval of the governor of the commonwealth."

Under § 5 (see also § 4 [d]), the Authority, to provide funds "to pay all or any part of the cost of any one or more projects included in the public facilities system," may provide "for the issuance . . . of one or more series of its public facilities system revenue bonds." To provide funds "to pay all or any part of the cost of any project to be excluded from the public facilities system, the Authority is . . . authorized to provide by resolution [see also the proviso in § 2 (c), already mentioned] for the exclusion of such project from the public facilities system and for the issuance . . . of one or more series of its project revenue bonds therefor." It also is provided that, "either in the resolution authorizing the issuance of revenue bonds for the stadium complex and the third vehicular tunnel or in the trust agreement securing the same," the Authority may "pledge as additional security such money as shall be paid from time to time by the city of Boston pursuant to its guaranty as provided in . . . [§ 21] of this act; provided, however, that such guaranty . . . shall terminate when any project other than the stadium complex and the third vehicular tunnel shall be included in the public facility system." Under § 6 any bonds may be secured by a trust agreement.

By § 7, subject to the proviso in § 4 (e), quoted above, concerning freezing of tolls for certain customers, the Authority is "to fix, revise, charge and collect tolls, rents, rates, fees and charges for admission to, or for the lease, use or occupancy of . . . the public facilities system, or any part thereof, or any project excluded from such system . . . and, except as otherwise provided . . . to contract with any person . . . respecting the lease, use, occupancy or operation of the public facilities system, or any part thereof, or any project excluded from such system and to reserve the right

to review or approve such tolls, rents, rates, fees and charges as may be . . . collected by any such person . . . and to fix such terms . . . respecting admission to, the lease, use, occupancy or operation of, or the services rendered by the public facilities system, or any part thereof, or by any project excluded from such system, as the Authority may deem desirable. Such rents, rates, fees and charges shall not be subject to . . . supervision or regulation by any . . . agency of the commonwealth or any political subdivision thereof." These charges are to be fixed in such a manner as to provide "net revenues sufficient, with any other available funds, to pay the principal, interest and any redemption premium on the bonds outstanding issued under this act . . . and to create reserves." All revenue in excess of that needed to pay current expenses and to provide reserves is to be pledged to a sinking fund and is immediately to become subject to the lien of such pledge. Section 8 provides that "[a]ll moneys received pursuant to the authority of this act . . . shall be deemed to be trust funds . . . held and applied solely as provided in this act." By § 9, holders of bonds or coupons and the trustee under any trust agreement are given stated rights to protect by legal proceedings their respective interests and "compel the performance of all duties required by this act . . . including the fixing, charging and collecting of tolls . . . and charges." By § 10 bonds issued under the act are made eligible for stated types of investment.

Sections 11 and 12 grant to the Authority a broadly expressed power, among others, to acquire land or interests therein, by various methods, including eminent domain. Section 12 somewhat vaguely provides that the "design of the stadium complex and the arena shall be subject to periodic review by the mayor of . . . Boston."

Section 13 authorizes the issuance of public facilities system or project revenue bonds for the purpose "of refunding the tunnel revenue bonds then outstanding issued by the Authority pursuant to" St. 1958, c. 598, as amended.

Section 14 permits the Authority to provide in any resolution authorizing public facilities system revenue bonds that the revenues derived from the public facilities system, after satisfactory provision has been made for the payment of current expenses and the payment of interest on the bonds, shall be transferred to the turnpike revenue bond sinking fund for the purpose of accelerating the payment of turnpike revenue bonds. When the turnpike bonds are paid, or when payment is provided for the bonds, the Massachusetts Turnpike "shall become a part of the public facilities system and tolls, rates, fees and charges shall be fixed, revised and collected for the use of or services rendered by the Massachusetts Turnpike until all bonds issued under the provisions of . . . [the] act . . . shall have been paid or sufficient funds for such payment shall be held in trust."

Section 16 authorizes the issuance of public facilities system or project revenue refunding bonds.

Under § 18, when all bonds issued under this act have been paid, or their payment provided for, the Worcester toll road, the Massachusetts Turnpike and the tunnels shall become the property of the Commonwealth, and the stadium complex and the arena shall become the property of the city of Boston. All excess funds shall be paid into the treasury of the Commonwealth.

By § 19 the Authority is made exempt from any taxes or assessments upon the public facilities system and any project excluded from the system and from taxes upon income therefrom. Bonds and interim receipts to be issued, their transfer, and income therefrom, are also made free from taxation of any kind, except inheritance taxes.

Section 21 provides for a somewhat limited interest guaranty by the city of Boston. "If sixty days before interest becomes due on . . . public facilities revenue bonds issued for the stadium complex and the third vehicular tunnel the secretary-treasurer of the Authority estimates that insufficient funds will be on hand to pay such interest," the city shall pay the amount of the deficiency to the

Authority "not less than fifteen days before such interest becomes due, provided, however, that said city shall be under obligation to make such payments only until it has paid five million dollars in the aggregate" under the act. The city's collector-treasurer, with the approval of the mayor, is authorized to borrow amounts needed to pay the deficiency. Amounts so paid are to be repaid to the city after there has been payment, or provision for payment, of all outstanding turnpike revenue bonds issued to pay for the turnpike, including the Boston extension. The guaranty is also referred to in § 5, as already noted, in the proviso that Boston's guaranty "shall terminate when any project other than the stadium complex and the third vehicular tunnel shall be included in the public facility system." The provision is to be read with the definition of "project" in § 2 (b), in which, it shall be noted, the "closed arena" is not made a part of the "stadium complex."

Section 23 directs that this act "shall be liberally construed to effect the purposes thereof." Section 24 contains a severability provision. Section 25 declares that all general or special laws, or parts thereof, inconsistent with this act are to be inapplicable to the provisions of this act.

Sixteen questions are asked. These are set out in Appendix B.

1. We discuss together questions 1, 2, and 3 which present issues under art. 2 of the Amendments to the Constitution of the Commonwealth as supplanted on November 8, 1966, by art. 89 (the so-called home-rule amendment) of the Amendments (for convenience referred to as art. 89). Pertinent provisions of art. 89 read: "*Section 1. Right of Local Self-Government.*—It is the intention of this article to reaffirm the customary and traditional liberties of the people with respect to the conduct of their local government, and to grant and confirm to the people of every city and town the right of self-government in local matters, subject to the provi-

sions of this article and to such standards and requirements as the general court may establish by law in accordance with the provisions of this article. . . . *Section 6. Governmental Powers of Cities and Towns.*—Any city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by section eight, and which is not denied, either expressly or by clear implication, to the city or town by its charter. This section shall apply to every city and town, whether or not it has adopted a charter pursuant to section three. *Section 7. Limitations on Local Powers.*—Nothing in this article shall be deemed to grant to any city or town the power to (1) regulate elections other than those prescribed by sections three and four; (2) to levy, assess and collect taxes; (3) to borrow money or pledge the credit of the city or town; (4) to dispose of park land; (5) to enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power; or (6) to define and provide for the punishment of a felony or to impose imprisonment as a punishment for any violation of law; provided, however, that the foregoing enumerated powers may be granted by the general court in conformity with the constitution and with the powers reserved to the General Court by section eight; nor shall the provisions of this article be deemed to diminish the powers of the judicial department of the commonwealth. *Section 8. Powers of the General Court.*—The general court shall have the power to act in relation to cities and towns, but only by general laws which apply alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two, and by special laws enacted (1) on petition filed or approved by the voters of a city or town, or the mayor and city council, or

other legislative body, of a city, or the town meeting of
a town, with respect to a law relating to that city or
town; (2) by a two-thirds vote of each branch of the
general court following a recommendation by the gov-
ernor; (3) to erect and constitute metropolitan or re-
gional entities, embracing any two or more cities or
towns or cities and towns, or established with other than
existing city or town boundaries, for any general or spe-
cial public purpose or purposes, and to grant to these
entities such powers, privileges and immunities as the
general court shall deem necessary or expedient for the
regulation and government thereof . . . ." The remainder
of § 8 need not be quoted.

Article 89 effected substantial changes in the legislative
powers of the General Court and the cities and towns.
Section 1 gives "to the people of every city and town the
right of self-government in local matters" subject to other
provisions of art. 89 and to "such standards . . . as the
general court may establish . . . in accordance with" art. 89.
The General Court has not yet prescribed standards in
respects here relevant. See 1967 Senate Doc. No. 1030,
p. 10; 1967 Senate Doc. No. 1547, pp. 22, 37. Compare,
however, legislation concerning other aspects of art. 89
found in G. L. c. 43B, inserted by St. 1966, c. 734, § 1.
Section 6 of art. 89 defines the powers of the several cities
and towns in greater detail than does § 1. Section 7 imposes
limitations (not directly relevant here) upon those powers.
Section 8 states in general terms certain powers reserved to
the General Court, which retains "the power to act in
relation to cities and towns" by general laws which apply
alike to a class of not fewer than two cities or towns, and by
special laws enacted as provided in clauses (1) to (4),
inclusive, of § 8.

We do not interpret the words "to act in relation to cities
and towns" as precluding the Legislature from acting on
matters of State, regional, or general concern, even though

such action may have special effect upon one or more individual cities or towns. If the predominant purposes of a bill are to achieve State, regional, or general objectives, we think that, as heretofore, the Legislature possesses legislative power, unaffected by the restrictions in art. 89, § 8. On the other hand, in instances where the primary purpose of a major and severable portion of a bill, otherwise enacted for State, regional, or general purposes, is to legislate "with respect to . . . [the] local government," or "local matters," of a particular city or town, it may be necessary to consider whether in the particular circumstances that severable major portion complies with § 8 of art. 89.

House No. 5486 in its major aspects proposes legislation designed for the general benefit not only of Boston but also of other communities and of persons residing outside Boston. It is at least regional legislation and has some Statewide effect. The legislative determinations in § 1 indicate this with respect to the multi-purpose stadium, the third vehicular tunnel, the Worcester toll road, and the arena. The Legislature may reasonably conclude that each of these projects "will promote the economic development of the commonwealth." Accordingly, we conclude that most aspects of the bill (subject to other constitutional considerations) may be enacted by the Legislature under its powers to legislate on general matters (see Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth) and does not constitute action "in relation to cities and towns" under art. 89, § 8. As to all features of House No. 5486, except § 21, we take the view that there is no necessity for compliance with art. 89, § 8 (1) or (2). We do not consider whether a bill dealing so extensively with the Authority would constitute action complying with art. 89, § 8 (3). See *Opinion of the Justices*, 334 Mass. 721, 734.

Section 21, which proposes a limited guaranty of interest payments on certain revenue bonds, is a significant section of House No. 5486, which has special application to Boston alone. Although the guaranty required by § 21 is much

limited, it imposes a special financial burden upon Boston
of a type which, if the provision stood by itself, might be
prohibited by art. 89, § 8, unless enacted in compliance with
clauses (1) and (2). Question thus exists whether § 21 may
be enacted, even as a part of House No. 5486, without
compliance with clause (1), if clause (1) is applicable at all
to the pending bill.

One recital in the order asking our opinion states that no
"bill . . . was filed with the . . . [city council] Order." The
recital, however, suggests that "it was the intention" of the
mayor and city council to approve essentially what is now
in House No. 5486. There is no reference in the recitals to
any petition filed by the city. Perhaps the city council's
order may be regarded as a petition, but the absence of any
document so designated raises an unnecessary ambiguity
concerning compliance with art. 89, § 8. Because any defi-
ciency in this respect may be corrected by subsequent city
action, we proceed to answer on the assumption that the
city will file a suitable petition containing the substance of
the city council order (perhaps modified in the light of our
opinion).

House No. 5486 clearly complies with the first two
general requirements (pars. A and B, see Appendix A) of
the city council order. There are, however, ten provisions
(hereafter for brevity referred to as council order provi-
sions) with each of which the council order expects the bill
(see par. C of that order) to conform, "unless an opinion of
the Justices . . . advises . . . that such [council order]
provision is unconstitutional." On these council provisions
we comment as follows: (1) The definition of "project" in
§ 2 (b) (1) satisfies the first council order provision. (2)
The ambiguous language of § 12, giving the mayor a power
of "periodic review" of the design of the stadium complex,
satisfies the second council order provision. Other portions
of § 12, lines 31-39, comply with the ninth council order
provision. These council order provisions and the corres-
ponding language of House No. 5486, it should be noted, do

not specify standards to be applied by the mayor of Boston in granting or withholding approval and may create undesirable disputes and uncertainty. They may also raise doubts concerning the validity of such a broad delegation. (3) The third council order provision is met by the description of the third tunnel found in § 2 (b) (1) of the bill. (4) Although the Authority is given power by § 4 (d) and § 13 of the bill to refund outstanding tunnel bonds, it is not required to do so. See also § 2 (d), lines 123-131. The term "cost of the project" in § 2 (d) is defined to include interest through January 1, 1976. Section 4 (e) in a proviso, states that tolls for the existing tunnels shall not be increased prior to January 1, 1976. This language of the bill, and the corresponding council order provision, are not valid for reasons discussed below in our answer to Question 5. We are of opinion that there is not complete compliance with the fourth council order provision, although the extent of noncompliance is not great. (5) Section 21 of the bill, read with § 5, lines 75-84, appears to conform with the fifth council order provision. (6) In view of the breadth of the discretions given to the Authority by § 2 (b) and (c), and § 5, lines 1 to 13, 75-84, to deal separately with the several projects authorized by House No. 5486, and the generality of the provisions of § 14, there will not necessarily be compliance with the precise terms of the sixth council order provision. See also § 21, lines 32-38. The Authority, in our opinion, would have power in its discretion to effect such compliance but is not required to do so. (7) Section 4 (e) of the bill, lines 67-70, incorporates the requirements of the seventh council order provision. In our opinion, however, that provision is invalid for reasons stated below in our answer to Question 4. (8) Section 18 of the bill complies in substance with the eighth council order provision. Section 20 of House No. 5486 complies in substance with the tenth council order provision.

Our review of the bill and of the city council order thus shows (1) that the order, if embodied in a petition, would

request the Legislature to enact essentially the provisions of § 21 of the bill, subject to the council order provisions, (2) that most of the council order provisions (par. C) are met by House No. 5486 with insubstantial variations, (3) that some of the council order provisions and the corresponding provisions of House No. 5486 are not constitutionally permissible for reasons stated below (and, therefore, by the terms of par. C of the council order, are not insisted on by the city), and (4) at least two of the council order provisions (as noted above) are somewhat vague.

If the city, as suggested above, chooses to embody in a petition the substance of the city council order (with modifications to adapt it to House No. 5486 and to this opinion), no question of compliance with art. 89, § 8 (1), will exist. Even if the city does not do this, however, we are of opinion that the city, by its present action (if that action is expressed in a suitable petition), will have requested, in somewhat general language, the enactment of § 21, upon terms and conditions with which House No. 5486 substantially complies. The city council order does not purport to request precise compliance by the General Court with the council order provisions, nor does it state that the city would seek no legislation in preference to having the council order provisions (so far as constitutionally valid) amended or varied. At least in the absence of a request by a city or town for legislation in terms strictly limited by the applicant city or town, we are of opinion that the Legislature, acting under art. 89, § 8 (1), may reasonably vary the form and substance of the requested legislation within the scope of the general public objectives of the petition.

The inclusion in House No. 5486 of the arena and the Worcester toll road does not affect our view just expressed. Section 21 is the only provision of the bill which could be thought to require compliance with art. 89, § 8 (1). By § 5, lines 81-84, of House No. 5486, Boston's guaranty is to terminate "when any project other than the stadium complex and the third vehicular tunnel shall be included in the

public facility system," which, we assume, means the "public facilities system" defined in § 2 (c). The Authority has power under § 2 (b) and (c) and § 5 to deal with each item of proposed construction separately. Boston's guaranty is sufficiently limited by the provision of § 5, lines 81-84, to prevent any unfairness to Boston (with respect to § 21) from including in the bill projects other than the stadium complex and the third vehicular tunnel.

Because we conclude that House No. 5486 substantially conforms with the city council order, we do not consider whether § 21 could be imposed upon Boston, in any event, as a matter reasonably incidental to legislation predominantly for the Statewide, regional, and general objectives of House No. 5486.

Subject to the foregoing discussion, and to the city's filing of an appropriate petition, we answer Questions 1 and 2, "No," and Question 3, "Yes."

2. Question 4 inquires whether the General Court by § 4 (e) may limit to present toll levels future tunnel tolls for motor vehicles garaged in East Boston until the bonds to be issued for the stadium complex and the third vehicular tunnel have been retired. Doubtless many East Boston automobiles have more frequent occasion to use the tunnels than some vehicles garaged elsewhere in Boston or in the Commonwealth. The benefits derived from the tunnels by all vehicles and users are the same in character. Vehicles not garaged in East Boston proceed through the tunnels for many reasons and bound for many different destinations. The tunnels are the principal means of access to Logan Airport. To such users, the tunnels are as important as they are to residents of East Boston who wish to reach Boston. We recognize that the Legislature has broad discretion to make reasonable legislative classifications. See *Cabot* v. *Assessors of Boston*, 335 Mass. 53, 69-70, app. dism. 354 U. S. 907; *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.* 344 Mass. 695, 700, et seq.; *Commonwealth* v. *Leis*, 355 Mass. 189, 196-198; *Commonwealth* v. *Gomes*, 355 Mass.

479, 486. See also *Opinion of the Justices*, 341 Mass. 760, 781-783. Nothing presented to us, however, shows this classification to be reasonable or otherwise than arbitrary, discriminatory, and capricious. The proposed classification is not now supported by any presumption of validity based on legislative enactment. See *Opinion of the Justices*, 337 Mass. 777, 781-782; *Opinion of the Justices*, 351 Mass. 716, 727. Cf. *Opinion of the Justices*, 320 Mass. 773, 779-780. We answer Question 4, "No."

3. The fifth question (see Appendix B, *post*, 809) asks whether it is within the power of the Legislature to enact the proviso in § 4 (e), that tolls for the two existing tunnels shall not be raised prior to January 1, 1976, in view of "the Authority's contract with the holders of its [outstanding] tunnel revenue bonds." Although the request for our opinion did not transmit attested copies of the outstanding tunnel bonds and the related trust indentures, these have been supplied through counsel for the Authority.

The tunnel revenue bond trust agreement (April 1, 1959) provides (§ 501) comprehensively for the original fixing and subsequent revision of tunnel tolls, with the participation of traffic engineers (§ 706), in accordance with stated standards clearly designed, so far as practicable, to maintain tunnel revenues sufficient to meet stated Authority obligations. These include current expenses, replacements, and deposits to the sinking fund, as more fully set out in the trust agreement. It obviously is intended that the bondholders will be protected by whatever toll revisions may prove to be necessary and practicable, free of any arbitrary restrictions on those revisions. Such a provision in support of revenue bonds, particularly in a period of inflation, may be important. The form of the bonds (see trust agreement, p. 7) refers to the pertinent provisions of the trust agreement.

These provisions of the trust agreement and the bonds are authorized by the statute under which the outstanding tunnel bonds were issued. See St. 1958, c. 598, §§ 9, 10, 11.

These bonds are not debts of the Commonwealth or of any of its political subdivisions, see c. 598, § 3, and their payment is dependent upon the maintenance of tunnel revenues.

The proviso in § 4 (e) of House No. 5486 would impose an arbitrary restriction of toll revisions which would seriously affect the Authority's contractual arrangements with its bondholders. It would be a direct legislative repudiation of an arrangement which the 1958 statute empowered the Authority to make, going to the essence of the bond contract and materially reducing the attractiveness of the revenue security. There is in House No. 5486 no proposed legislative determination, nor is there any suggestion in the papers before us, of any such substantial public interest of health, morals, safety, or general welfare, as might justify this proposed direct, unequivocal, legislative impairment of the very contract contemplated by the 1958 statute and made by the Authority, itself a public instrumentality, see St. 1952, c. 354, § 3, and "an agency of State government." See *Gardner* v. *Massachusetts Turnpike Authy.* 347 Mass. 552, 562. See also *Commonwealth* v. *Toomey,* 350 Mass. 345, 347-351. In the circumstances known to us or of which we may take judicial notice the proviso contained in § 4 (e) cannot be said to be within the scope of permissible legislative action tending to impair prior State authorized obligations, under prior decisions and opinions construing or applying art. 1, § 10, of the Constitution of the United States. See e.g. *Opinion of the Justices,* 261 Mass. 523, 552-553; *Opinion of the Justices,* 293 Mass. 589, 598-608; *Opinion of the Justices,* 334 Mass. 721, 735-738, 740-741; *Opinion of the Justices,* 341 Mass. 760, 783-786. Cf. *Boston Elevated Ry.* v. *Commonwealth,* 310 Mass. 528, 548-557.

Section 502 of the trust agreement provides that tolls are to be "uniform in application to all traffic falling within any reasonable class regardless of the status or character of any person . . . participating in the traffic" and that "no reduced

rate of toll will be allowed within any such class," with exceptions not relevant. Also, "no free . . . passage will be permitted," subject to exceptions not relevant. This latter provision has obvious application to the portion of the proviso in § 4 (e) considered in our answer to Question 4.

We answer Question 5, "No."

4. We discuss together questions 6, 7, 8, 9, 10, 12, 15, and 16 which raise in various aspects the question whether any proper public purpose will be served by the stadium complex and the arena (and their proposed subsidiary facilities) by the use of public funds or with the assistance of various advantages (e.g. tax exemption and the power to acquire property by eminent domain), as more fully stated in House No. 5486 and in the questions.

We are of opinion that a large multi-purpose stadium or an arena for public activities and events, conventions, professional and amateur athletic events, and other large gatherings may be for a public purpose if the expenditure of public funds, the extension of public privileges, powers, and exemptions, and the use, rental, and operation of the projects are adequately governed by appropriate standards and principles set out in the legislation. The Legislature may reasonably determine that there are economic, civic, and social advantages to Boston, to eastern Massachusetts, and to the Commonwealth as a whole, from providing in the largest city in the State a stadium and an arena large enough to attract conventions and similar gatherings and to provide for audiences sufficient to support enterprises of interest to large numbers of people, and suitable to provide recreation and instruction to citizens and others. See *Boston* v. *Merchants Natl. Bank of Boston,* 338 Mass. 245, 248-252, and cases cited. See also two recent cases in Pennsylvania, which may go somewhat beyond our own decisions in various respects, *Martin* v. *Philadelphia,* 420 Pa. 14, 17; *Conrad* v. *Pittsburgh,* 421 Pa. 492, 496.

The provision of such facilities, however, is not as clearly and directly a public purpose as supplying housing, slum

clearance, mass transportation, highways and vehicular tunnels, educational facilities, and other necessities. As to such essential enterprises, the public objectives are well understood. The appropriate and usual methods of achieving them also, on the whole, are well established. In such cases, somewhat general standards of public convenience and necessity and principles of prudent, frugal government administration, necessarily to be implied from the essential projects themselves, may adequately guide the expenditure of public funds, even where there may be involved arrangements with private persons or entities operating for profit. See e.g. *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 542-553. See also *Boston* v. *Merchants Natl. Bank,* 338 Mass. 245, 249-252.

Enterprises like the stadium complex and the arena necessarily contemplate a substantial use of the facilities by nonpublic persons and entities and contracts between such persons and entities and the public agency operating the facilities. Some of these persons and entities will be operating for profit and using the facilities in their operation. If the stadium complex and arena under the proposed legislation can be operated, and if they should in fact be operated, so as in effect to subsidize private organizations operated for profit, then the facilities could not be said to exist for a public purpose, despite the type of legislative declarations, already quoted, made in § 1 of House No. 5486. Compare the situation considered in *Gould* v. *Greylock Reservation Commn.* 350 Mass. 410, 425-427, where, because in specific respects statutory authority had been exceeded, it was not necessary to decide whether "the commercial aspects of . . . [that] venture" operated "to deprive the project of any public purpose." On the other hand, if the legislation itself contains standards and principles governing and guiding the operation of the facilities in a manner which reasonably can be expected adequately (a) to protect all aspects of the public interest and (b) to guard against improper diversion of public funds and privileges for the benefit of private

persons and entities, then such enterprises may be found to be for public objectives. We thus must examine House No. 5486 to determine whether it states sufficiently, rather than leaving to be implied, the standards and principles which are to govern the policies of the Authority in operating the facilities.

The standards stated in House No. 5486 are vague and fragmentary. The proposed legislative determinations in § 1 are too indefinite to be the basis of adequate implied standards. For example, House No. 5486 contains no provisions stating the priorities among the several different types of use (civic, educational, athletic, and other) to be permitted as described in § 1 (a) (i) and (ii). No provisions of the bill seem designed to protect the public interest in having the stadium complex and arena used for all the activities mentioned in § 2, without having any one (e.g. professional athletics) fostered to the exclusion of other activities (e.g. civic, philanthropic, and educational meetings, conventions, labor meetings, amateur and school athletics, and the like) which, perhaps, are more usual objects of public expenditure or encouragement.

The definition of "project" § 2 (b) (1), already quoted, merely states that the stadium complex is to be "multi-purpose" and is "to provide facilities" for the listed types of activities. Section 4 (c), also already quoted, imposes no substantial restriction whatsoever upon the type of lease or contract for the use or management of the stadium complex or arena which the Authority may make, except that the Authority is to determine that each such arrangement "is in the public interest" and that any "rent" will enable the Authority to meet its obligations in connection with the leased facilities and except that leases or grants for more than one year shall be subject to the approval of the Governor.

Section 6 permits safeguards for the protection of bondholders in a trust agreement but no such agreement is required. Doubtless, as a practical matter, because of the

efforts of bond underwriters and their counsel to protect the bondholders, the public interest to some extent will also be protected. Nevertheless the public interest and the interests of the bondholders may not always coincide.

Under § 7, the Authority is given power to fix its own charges or to reserve the right of supervision of charges and use in the event of any lease or disposition of any of the facilities. No standards, however, other than the adequacy of charges to meet the Authority's obligations (see § 7, lines 26-34), are stated in § 7 for the exercise by the Authority of the powers so granted. Section 7, lines 21-25, also purports to preclude any governmental administrative review of the Authority's exercise of these powers.

By § 12, the Authority is subjected to various restraints in the construction of projects, changes of highways, relocation of tracts, and similar matters, and (see lines 117-133) competitive bidding is required with respect to construction contracts.

We are of opinion that such guidance to action of the Authority as is provided in House No. 5486 falls far short of clear indication of the principles to be applied by the Authority in determining basic policies for the projects, the relative weight to be given to various vaguely expressed statutory objectives, and the particular aspects of the public interest which are to be protected. There is no clearly expressed requirement that, in making arrangements with persons and entities operating for profit, the Authority shall impose on them charges representing at least the fair market value of the privileges afforded and at least comparable to those which would be charged by a prudent and diligent private owner of the same facility. There is no requirement that, in leasing the facilities, the Authority protect whatever public interest there may be in having the facilities available to a diversity of users on a fair basis, and not, for example, placed so exclusively at the disposal of one or more particular users that an equitable amount of use by others will be unduly restricted. Certainly the guidance

from statutory standards seems to us much less adequate than that given in other somewhat analogous situations. See e.g. *Opinion of the Justices,* 341 Mass. 760, 774, 780; *Massachusetts Housing Fin. Agency* v. *New England Merchants Natl. Bank, ante,* 202, 207, 212-215. The Authority cannot be left to work out the details of inadequately stated legislative policies. Cf. *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 544, and cases cited.

We are aware, of course, that the Authority's activities are subject to audit. See St. 1952, c. 354, § 15; St. 1962, c. 733. Also provisions in House No. 5486, such as § 7, lines 21-25, preventing administrative reviews of the fixing of charges by the Authority, we think, could not validly be applied to prevent judicial review of the Authority's compliance with statutory standards if they were properly stated. Neither an audit nor judicial review, however, can be effective restraints on arbitrary or improper action if adequate statutory standards are not stated.

In the absence of adequate statutory guidance and standards on the matters mentioned above, and of clear provision for reasonable review of compliance with appropriate standards, we are unable to advise that the stadium complex and the arena will be for a public purpose.

In the light of the foregoing discussion we comment more directly on the individual questions. As to Question 6 we entertain no doubt that bonds may be issued to pay the cost of a stadium complex and arena, if adequate principles, standards, and safeguards governing the execution of the project are included in the enabling legislation to make the project one for a public purpose. As to Questions 7 and 8 we are of opinion that the auxiliary and incidental activities and functions mentioned in the questions may be included in a project if they are to be conducted under adequate statutory standards, and that leases and concessions may be negotiated and effected in accordance with such standards, if they are provided. As to Questions 9 and 15, under

suitable statutory standards, provision of facilities in aid of a proper public purpose will not be rendered unconstitutional simply because individuals or private entities, as such, incidentally may profit. See *Opinion of the Justices,* 354 Mass. 779, 785-786, and cases cited. We think that the existence of a proper public purpose will not be destroyed if the Authority makes proper leases of the stadium complex or the arena (pursuant to a statute containing appropriate standards) to a privately owned entity operating for profit. Indeed such leases may be essential to obtaining the revenues with which to pay the proposed bonds. See *Boston* v. *Merchants Natl. Bank,* 338 Mass. 245, 249. The lease of State owned or State financed facilities to private enterprises is not a novelty. See e.g. the situations considered in *Dehydrating Process Co. of Gloucester, Inc.* v. *Gloucester,* 334 Mass. 287, *Gloucester Ice & Cold Storage Co.* v. *Assessors of Gloucester,* 337 Mass. 23, and *Assessors of Newton* v. *Pickwick Ltd., Inc.* 351 Mass. 621, and cases cited in these three decisions. As to Questions 10 and 16, if House No. 5486 should be in fact revised to include such statutory principles and standards as will make the construction and operation of the stadium and arena for a proper public purpose, we are of opinion that the Authority may be granted both power to take land by eminent domain and tax exemption. See *Dodge* v. *Prudential Ins. Co.* 343 Mass. 375, 383-384.

We, of course, have no occasion upon these questions now to consider the scope of the proposed eminent domain power. See *Appleton* v. *Massachusetts Parking Authy.* 340 Mass. 303, 310; *Commonwealth* v. *Massachusetts Turnpike Authy.* 346 Mass. 250, 254, and 349 Mass. 1, 3-4.

In the light of the foregoing discussion and the absence of adequate statutory standards in House No. 5486, and with respect to that bill in its present form only, we answer as follows:

Question 6—"No."
Question 7—"No."

Question  8—"No."
Question  9—"No."
Question 10—"No."
Question 12—"Yes."
Question 15—"No."
Question 16—"No."

5. Question 11 does not specify any respects in which § 21 may deprive the city of Boston of property without due process of law. Its import is not wholly clear. See *Opinion of the Justices,* 347 Mass. 797, 798. We interpret this very general question as asking only whether, in the circumstances, which of course include the Boston city council order already discussed, § 21 is an obligation which the General Court may impose upon the city at its request. Subject to the consideration of other constitutional questions already discussed, we perceive on the facts before us no respect in which Boston will be deprived of its property without due process of law by the enactment of § 21 authorizing or requiring the city to enter into a limited interest guaranty in aid of projects to be carried out by a State agency within the city and largely for Boston's benefit. Because of the general character of the question we ask to be excused from making a more specific answer.

6. Questions 13 and 14 are complicated in form. Question 13 refers to § 14 of House No. 5486 authorizing (line 2 et seq.) the Authority to provide that turnpike revenues (which, upon the occurrence of certain future events, would now go to the Commonwealth) shall be retained by the Authority until payment of the bonds issued under the present bill is made (or provision is made for such payment; see § 14, lines 17-31). Question 13, in effect, appears to ask whether the provisions of § 14 will convert the revenue bonds to be issued under House No. 5486 into debts of the Commonwealth, obtaining authority for which would require a two-thirds vote of each house of the General Court. See art. 62, § 3, of the Amendments to the Constitution of the Commonwealth. Similarly, Question 14 refers to

the circumstance that the city of Boston, in effect and ultimately, could meet its obligations under the limited interest guaranty imposed by § 21 of House No. 5486 only from funds raised by taxation. Question 14 then inquires whether those circumstances convert the proposed revenue bonds into debts of the Commonwealth, also requiring for their authorization a two-thirds vote of each house.

We are of opinion that, in the circumstances of this bill, Questions 13 and 14 are each answered by the overriding provisions of § 3 of House No. 5486 that bonds issued under the bill, if enacted, "shall not constitute a debt of the commonwealth." See the analogous provisions considered in *Massachusetts Housing Fin. Agency* v. *New England Merchants Natl. Bank, ante,* 202, 215-218. See also *Opinion of the Justices,* 322 Mass. 745, 751-752. Section 14 authorizes the Authority to agree with bondholders that there will be placed at the disposal of the Authority, thus making more likely the payment of the revenue bonds to be issued, certain of the Authority's possible (but not assured) future revenues which would otherwise go to the Commonwealth. The Commonwealth, however, under § 14, or otherwise, does not undertake to pay the bonds. Section 21 requires a city of Boston interest guaranty, but the Commonwealth does not agree to become liable thereunder or upon the bonds. We are of the view that, under the bill, the Commonwealth is not itself, directly or by subterfuge, to incur any debt, or guaranty obligation, or to engage itself in any borrowing. The situation is unlike that discussed in *Singleton* v. *Treasurer & Recr. Gen.* 340 Mass. 646, 649-651, where the Commonwealth under legislation not adopted in compliance with art. 62, was authorized to borrow, and that in *Ayer* v. *Commissioner of Admn.* 340 Mass. 586, 594, where, under a complicated rental scheme, we held the Commonwealth to be itself in effect the obligor upon bonds of a purported entity which we regarded (pp. 592-593) as "nothing more than a mere intermediary to carry out only one purpose."

Because of doubts concerning the precise meaning of Questions 13 and 14, we ask to be excused from giving answers to those questions, respectively, beyond the foregoing general discussion.

RAYMOND S. WILKINS.
JOHN V. SPALDING.
ARTHUR E. WHITTEMORE.
R. AMMI CUTTER.
JACOB J. SPIEGEL.
PAUL C. REARDON.

With one exception I agree with the answers of my colleagues. The single exception is the answer to Question 4.

I believe that there is a rational basis for the distinction made by the Legislature regarding East Boston residents. The basis consists of the facts of geography, political structure and recent history. East Boston is an island. It has always been a part of the city of Boston. Since the abandonment of the ferry service many years ago the tunnels afford to the residents of East Boston the only direct means of vehicular access to the central city. These residents bear the toll burden with greater frequency than persons from any other part of the city or beyond. The Legislature may properly and reasonably determine that increased tolls, made necessary by the construction of an additional tunnel which is not at all convenient or necessary for the residents of East Boston, should not, in fairness, be paid by them.

If it be said that the distinction is unfair to tunnel users from Winthrop, Chelsea and Revere, the Legislature's answer could well be that these communities do not contribute to the support of Suffolk County, of which they are a part; whereas the residents of East Boston, as taxpayers of Boston, do contribute to the support of Suffolk County.

In the main, persons whose cars are customarily garaged in East Boston are persons who live there and who use the tunnels to get to and from their work. East Boston to them is not a part of a route home. It is home. They, therefore, are in a substantially different situation from those who use the tunnels to pass through East Boston to get to their homes to the north or to the racetrack in Revere or to the Logan airport, or elsewhere.

Recent litigation in this court has demonstrated that to residents of East Boston the airport has become a source of incessant noise and a symbol of home displacement. These and other considerations might well have contributed to the Legislature's conclusion that those who suffer these inconveniences and gain no advantage from the construction of a new tunnel should not be required to pay more than they now pay.

As my colleagues point out, there are reasons, contractual in nature and probably constitutional in significance, which preclude a special toll rate for East Boston residents. I find, however, no basis for saying that the special rate is unconstitutional because it is unreasonably discriminatory.

Accordingly, my answer to Question 4 is, "Yes."

PAUL G. KIRK.

APPENDIX A.

ORDER ADOPTED BY THE BOSTON CITY
COUNCIL
AND APPROVED BY THE MAYOR.

*Ordered,* That a petition to the general court, accompanied by a bill for a special law relating to the city of Boston to be filed with an attested copy of this order be, and hereby is, approved under clause (1) of section 8 of article 2, as amended, of the Amendments to the Constitution of the Commonwealth of Massachusetts—to the end that legislation be enacted

A. Providing for the financing, construction, maintenance and operation by the Massachusetts Turnpike Authority of a multi-purpose sports stadium complex and a third harbor tunnel for vehicular traffic in the city of Boston, and

B. Containing provisions relative to the fixing, revising, charging and collection of rents, tolls, and charges (including, if deemed by said Authority necessary or advisable, a user charge based generally on a percentage of the price of each ticket of admission to the stadium), and the issuance of revenue bonds and revenue refunding bonds and the eligibility of such bonds for investment, a trust agreement or agreements, pledge of revenues, remedies of bondholders, exemption from taxation, power of eminent domain, and other provisions customary in legislation providing for a project to be financed by revenue bonds, and

C. Also containing each of the following provisions unless an opinion of the Justices of the Supreme Judicial Court advises the Governor or either or both branches of the Legislature that such provision is unconstitutional:

1. The stadium shall be constructed on a site to be selected by said Authority with the approval of the mayor of the city of Boston, hereinafter called the mayor, located

generally between the South Station and the Broadway station of the Massachusetts Bay Transportation Authority, except that if it is determined by a professional study made for the Massachusetts Turnpike Authority that such site is not economically or otherwise feasible, the stadium shall be constructed on such other site in the city of Boston as will be selected by said Authority with the approval of the governor and the mayor.

2. The design of the stadium shall be subject to periodic review by the mayor, giving due consideration to construction costs and to the fact that the project will be financed by revenue bonds.

3. The third tunnel shall be constructed from a portal in Fort Point channel in the city of Boston under Boston harbor to a portal and toll plaza adjacent to the west side of Pier 1 in the East Boston district of said city.

4. The tunnel bonds of said Authority now outstanding shall be refunded to enable operation of all three tunnels as a single project; but the cost of the third tunnel and the stadium shall be defined to include the interest payable on or before January first, nineteen hundred and seventy-six, on bonds issued under the legislation herein approved; and the tolls now in effect for the existing tunnels shall not be increased prior to said date.

5. The city of Boston shall guarantee payment of interest on the revenue bonds issued to refinance the existing tunnels and to finance the stadium and third tunnel up to, but not exceeding, five million dollars in the aggregate, but only to the extent of a deficiency in net revenue available for the payment of interest on such bonds produced by the three tunnels and stadium.

6. The Massachusetts Turnpike (including the Boston Extension), when debt free, will continue to be operated as a toll facility with the net revenues, after operating costs, applied first to repayment to the city of Boston of any amounts which may have been paid by said City pursuant to its guaranty, and second to the payment of interest on,

and the retirement of, all bonds issued under the legislation herein approved.

7. Until the bonds issued under the legislation herein approved are paid, said Authority shall not fix or charge a toll for the use of any of the three tunnels by a vehicle customarily garaged in the East Boston district of Boston which is higher than that now in effect for the existing tunnels.

8. Title to all three tunnels will vest in the commonwealth upon retirement of all bonds issued under the legislation herein approved: and title to the stadium will vest in the city of Boston upon retirement of all bonds issued under the legislation herein approved.

9. The location of the connector roads to the third tunnel, so far as financed by said Authority, shall be subject to the approval of the mayor: and all relocation of city streets or temporary detours necessitated by construction of the stadium and tunnel shall be subject to approval of the Public Works Department of the city of Boston.

10. The preliminary expenses of said Authority for the in-depth studies and engineering and traffic reports required to support the sale of revenue bonds for the project will, as is customary, be advanced by the commonwealth, with the commonwealth repaid out of the proceeds of the bonds first issued under the legislation herein approved: but neither the credit of the commonwealth nor the credit of any political subdivision thereof shall be pledged except as hereinbefore specifically provided.

APPENDIX B.

QUESTIONS PROPOUNDED BY THE ORDER OF
THE HOUSE OF REPRESENTATIVES.

*Ordered,* That the opinions of the Honorable the Justices
of the Supreme Judicial Court be required by the House of
Representatives upon the following important questions of
law:—

1. Whether House, No. 5486 violates the provisions of
Section 7, or clause 1 of Section 8 of Article II of the
Articles of Amendment of .the Constitution of the Com-
monwealth of Massachusetts, in that such bill does not
conform and is not fully responsive to the petition of the
City of Boston addressed to the General Court requesting,
pursuant to clause 1 of Section 8 of said Article II, the
enactment of legislation in conformity with the order
adopted by the City Council of the City of Boston?

2. Whether House, No. 5486 is of such nature that in its
enactment the General Court is required to conform to the
provisions of Article II of said Articles of Amendment
vesting home rule power in the City of Boston and others,
since the provisions of section 4 of House, No. 5486 pertain
to the financing and construction of public facilities to meet
state-wide needs and to serve Commonwealth purposes and
only as an incident thereto does the bill in section 21 vest in
the City of Boston the power to borrow money and to
pledge the credit of the City in satisfaction of its guaran-
teed obligation under the provisions of House, No. 5486?

3. Whether it is within the competence of the General
Court, in the light of the provisions of Article II of said
Amendment, to enact House, No. 5486 in such form that
does not fully conform and is not fully responsive to said
petition of the City of Boston and otherwise includes

provisions authorizing the Authority to finance and construct facilities not included in said petition, such as the Worcester Toll Road, an arena and certain parking and appurtenant facilities as provided in section 4 thereof?

4. Whether it is within the competence of the General Court to enact, as part of House, No. 5486, the proviso in section 4 (e) thereof providing that the Authority shall not fix or charge tolls for the use of Sumner Tunnel, Lt. William F. Callahan, Jr. Tunnel, and the third vehicular tunnel authorized under House, No. 5486 by any vehicle customarily garaged in the East Boston District of the City of Boston which are higher than the tolls presently in force for the Sumner and Lt. William F. Callahan, Jr. Tunnels until such time as the bonds issued pursuant to House, No. 5486 to pay the cost of the third vehicular tunnel and the stadium complex have been paid, entailing consideration of the question whether House, No. 5486 in that respect conflicts with the equal protection of the laws and the due process of law provisions of the United States Constitution and the Constitution of the Commonwealth in that such proviso is unfairly and unreasonably discriminatory with respect to the use of said tunnels by vehicles not customarily garaged in the East Boston District that are owned and operated by other citizens of the City and the Commonwealth and by out-of-state citizens who are denied the privilege of a similar freeze on such tolls?

5. Whether it is within the power of the General Court to enact, as part of House, No. 5486, the proviso in section 4 (e) thereof providing that tolls now in effect for the existing tunnels shall not be increased prior to January 1, 1976, entailing consideration of the question whether House, No. 5486 violates the amendment of the Constitution of the Commonwealth and section 10 of Article 1 of the United States Constitution on the ground that it would violate the Authority's contract with the holders of its tunnel revenue bonds now outstanding with respect to the Authority's obligation to from time to time fix and revise

tolls to the end that the bonds will be paid at their maturity?

6. Whether it is competent for the General Court to include in House, No. 5486 in sections 4 and 5 provisions for the issuance of bonds to pay the cost of a stadium complex and an arena and to build, maintain and operate, or cause to be maintained and operated, such stadium complex or such arena in view of the basic constitutional principle that public funds must be expended solely for public purposes in pursuance of a legitimate governmental function for the common good which is implicit in the due process of law provisions and in the Preamble, Part 1, Articles 5, 6, 7, 10, Part II, c. 1, Section 1, Article 4, and Part II, c. 2, Section 1, Article II of the Constitution of the Commonwealth?

7. Whether the General Court has the power to authorize the Authority in sections 2 and 4 of House, No. 5486 to finance, construct and operate, or cause to be operated, a stadium complex or an arena in the City of Boston providing facilities for athletic, recreational, civic, educational, cultural, patriotic and entertainment activities, events, contests, exhibitions, and performances of various kinds, including, among others, parking facilities, public transportation terminals, food and alcoholic and non-alcoholic beverage facilities, lands, rights of way and other interests in land and property as may be necessary or convenient?

8. Whether the General Court has the competence to provide in section 4 (c) of House, No. 5486 for the financing, construction and operation of facilities, as part of the stadium complex or arena, for providing food and beverages, parking for privately owned vehicles and other accommodations and conveniences for the general public through leases, concessions, or otherwise?

9. Whether the General Court has the competence to include in section 4 (c) of House, No. 5486 provision authorizing the Authority to lease the facilities of the stadium complex or the arena to any individual, private association or private corporation for profit-making pur-

poses, and whether such provisions serve a public purpose?

10. Whether the General Court has the competence to include in section 11 of House, No. 5486 provisions authorizing the Authority to take real property through the exercise of the eminent domain power under Article X of the First Part and Article XXXIX of the Articles of Amendment of the Constitution for the purpose of constructing and operating a stadium complex or arena?

11. Whether the provisions of section 21 of House, No. 5486 imposing on the City of Boston an obligation to guarantee interest on certain bonds for the stadium complex and to issue City of Boston bonds to meet such guaranty obligation and to levy taxes for the purpose of paying such City of Boston bonds amount to a deprivation of property without due process of law or are otherwise violative of the due process clause of the Constitution of the United States or the Commonwealth?

12. Whether the provisions of House, No. 5486 vesting in the Authority powers to locate, finance, construct and operate the projects and other facilities mentioned therein constitute an unlawful delegation of powers by the General Court in violation of Part I, Article 30, Part II, c. 1, Section 1, Article 4, Part II, c. 2, Section 1, Article II of the Constitution in that House, No. 5486 fails to provide guides and standards which are sufficiently precise and definite as not to entail an unlawful delegation of legislative powers to the Authority?

13. Whether the General Court has the competence to provide in section 14 of House, No. 5486, assuming enactment thereof without a two-thirds vote of each house, that when the turnpike revenue bonds issued by the Authority for the Massachusetts Turnpike (with the Boston Extension), including principal, interest and redemption premium, if any, and all other obligations of the Authority in connection therewith have been paid, or sufficient funds are held in trust for such payment, the Authority shall continue to impose and collect tolls and charges for the use of such

turnpike and such turnpike will become a part of the public facilities system created under section 4 of House, No. 5486 and the revenues of such turnpike will be applied, in the same manner as other revenues of the public facilities system, to the payment of the bonds issued under House, No. 5486 and whether devoting such turnpike and its revenues to such purpose will result in converting the revenue bonds of the Authority under House, No. 5486 into debts of the Commonwealth created without the necessary two-thirds vote in each house of the General Court, as required under Article 62, Section 3, because the Massachusetts Turnpike which otherwise under existing law would have reverted to and become the property of the Commonwealth, will be diverted by House, No. 5486 to support bonds issued for a stadium complex, an arena and other facilities through the device of continuing such turnpike in operation by the Authority upon a toll-paid basis?

14. Whether the General Court will exceed constitutional limits by providing in section 21 of House, No. 5486, without a two-thirds vote of each house, for a guaranty by the City of Boston of certain other bonds to be issued by the Authority under the bill, which guaranty is to be effectuated by the provisions of section 21 of House, No. 5486 authorizing the issuance of City of Boston bonds and the pledge of the full faith and credit of the City therefor and whether, therefore, the securing of the Authority's bonds by such obligation and pledge of the City results in converting the Authority's bonds into debts of the Commonwealth upon the grounds that House, No. 5486 constitutes a mere device of the Commonwealth to authorize the issuance of tax-supported bonds by a state instrumentality without the two-thirds vote?

15. Whether the General Court has the competence to provide in section 4 of House, No. 5486 that the stadium complex or arena, or any part thereof, may be leased to an individual, a private association or a corporation which is privately owned, for profit-making purposes, in that public

funds of the Authority, and public funds of the City of Boston derived from taxation, are made available for the benefit of such lessee in violation of the prohibition against the lending of the public credit in Article 62 of the Amendments to the Constitution and the due process clause in the United States and in the Commonwealth Constitutions?

16. Whether the General Court has the competence to provide in section 19 of House, No. 5486 that the stadium complex, the arena, parking and other appurtenant facilities and other property held by the Authority pursuant to House, No. 5486 shall be exempt from taxation and assessment?