YANKEE ATOMIC ELECTRIC COMPANY & others[1] *vs.*
SECRETARY OF THE COMMONWEALTH & others.[2]

Suffolk.  May 5, 1988, August 3, 1988. — August 11, 1988.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Constitutional Law*, Initiative petition, Eminent domain. *Initiative. Attorney General. Eminent Domain*, What constitutes taking, Payment of award. *Administrative Law*, Official notice.

A factual inquiry undertaken by the Attorney General in determining, pursuant to pertinent provisions of art. 48 of the Amendments to the Massachusetts Constitution, whether to certify that a proposed initiative petition contained no subjects constitutionally excluded from the initiative process was reasonable, where all the facts which this court considered to be implicit in the petition's language and subject to judicial notice were contained in the inquiry, and where further facts apparently subject to the Attorney General's official notice were not arbitrarily omitted. [208] LYNCH, J., dissenting with whom LIACOS, J., joined.

In an action challenging the Attorney General's certification of a certain proposed initiative petition pursuant to pertinent provisions of art. 48 of the Amendments to the Massachusetts Constitution, on the ground that the measure, if enacted, would effect an uncompensated appropriation of private property to public use (a regulatory taking), a matter excluded from the initiative process by art. 48, The Initiative, II, § 2, this court held that the facts implicit in the petition's language taken with those susceptible of the Attorney General's official notice did not establish that the petition effected a regulatory taking, and therefore, it was reasonable and proper for the Attorney General to certify the petition. [208-211] LYNCH, J., dissenting, with whom LIACOS, J., joined.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on January 27, 1988.

[1] Eleven registered voters of the Commonwealth.

[2] The Attorney General of the Commonwealth. The original ten signatories of the initiative petition were allowed to intervene.

Amicus briefs were filed by Boston Edison Company and New England Legal Foundation.

The case was reported by *Lynch*, J.

The case was submitted on briefs.

*Thomas R. Kiley, Robert E. Sullivan, Laurie S. Gill & David R. Friedman* for the plaintiffs.

*James M. Shannon*, Attorney General, *Thomas A. Barnico & Paul A. Lazour*, Assistant Attorneys General, for the Secretary of the Commonwealth & another.

*Ellen J. Messing* for Christopher J. Hodgkins & others, interveners.

*William S. Stowe*, for Boston Edison Company, amicus curiae.

*Patrick W. Hanifin & Wayne S. Henderson*, for New England Legal Foundation, amicus curiae.

HENNESSEY, C.J. The plaintiffs filed a complaint in the Supreme Judicial Court for Suffolk County seeking relief in the nature of certiorari and mandamus respectively against the Attorney General and the Secretary of the Commonwealth in their official capacities. The plaintiffs challenge the Attorney General's certification of an initiative petition pursuant to art. 48 of the Amendments to the Constitution of the Commonwealth. Art. 48, The Initiative, II, § 3.[3] The petition, entitled "The Stop Nuclear Waste Act" by its proponents, would, after July 4, 1989, prohibit "generation of electric power by commercial nuclear power plants in the Commonwealth by means which result in the production of nuclear waste." The plaintiffs also seek to prevent the Secretary of the Commonwealth from having the initiative measure placed on the ballot in the upcoming State election. See art. 48, The Initiative, IV, § 5. The single justice reserved and reported the case for consideration by the full court on the parties' motion.

The plaintiffs maintain that the petition, if enacted, would constitute a "taking" of the property of plaintiff Yankee Atomic Electric Company and one other electric utility within the Commonwealth, and that the Attorney General is therefore required under art. 48 to decline to certify the initiative petition for a place upon the ballot.

---

[3] All references are to art. 48 as amended by art. 74, by art. 81, and by art. 108 of the Amendments to the Constitution of the Commonwealth.

This is the second decision and opinion of this court relating to this controversy. On July 7, 1988, this court's opinion in *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth,* 402 Mass. 750 (1988) (Yankee One), ordered the Attorney General to make an examination of the facts relating to the initiative petition. The court stated that the Attorney General's duty under the Massachusetts Constitution, art. 48, The Initiative, is to certify proposed initiative petitions, and this duty requires the Attorney General to determine, among other things, whether the petition contains matter excluded from the initiative process by art. 48, The Initiative, II, § 2.[4] Among the matters thus excluded from the initiative are propositions inconsistent with the right to receive compensation for private property appropriated to public use. In response to the plaintiffs' argument that the Attorney General is required to make a factual investigation and analysis in order to determine whether the proposed initiative should be excluded from the ballot, the court stated that the factual examination required of the Attorney General is limited to matters implicit in the language of the petition and to matters of which the Attorney General may properly take official notice. The court, in defining official notice, stated: "Factual matters which are 'indisputably true' are subject to judicial notice; these include '[m]atters of common knowledge or observation within the community.' . . . Official notice includes matters subject to judicial notice, as well as additional items of which an agency official may take notice due to the agency's established familiarity with and expertise regarding a particular subject area." (Citations omitted). *Yankee One, supra* at 759 n.7.

---

[4] Article 48, The Initiative, II, § 2, provides in relevant part as follows:

"*Excluded Matters* . . . No proposition inconsistent with any one of the following rights of the individual, as at present declared in the declaration of rights, shall be the subject of an initiative or referendum petition: The right to receive compensation for private property appropriated to public use; the right of access to and protection in courts of justice; the right of trial by jury; protection from unreasonable search, unreasonable bail and the law martial; freedom of the press; freedom of speech; freedom of elections; and the right of peaceable assembly."

Article 48, The Initiative, II, § 3, provides in relevant part as follows:

In *Yankee One*, in ordering that the Attorney General must make the limited factual examination as defined by the court, we further stated that if it is the Attorney General's decision to affirm his certification after factual examination, the certification shall be considered to be valid ab initio. *Id.* at 759-760. We also directed that the county court was to retain jurisdiction of this case, and that the single justice in his discretion was to enter orders to expedite the proceedings. *Id.* at 760. Subsequently, pursuant to a time schedule ordered by the single justice by agreement of the parties, the Attorney General on July 19, 1988, filed in the county court a copy of his letter of that date to the Secretary of the Commonwealth in which the Attorney General affirmed his certification of the petition. Subsequently, the single justice reported the case back to the full court without decision.[5]

The Attorney General in his letter of July 19, 1988, stated: "In reexamining the validity of the petition I have considered those facts implied by the petition's language and those officially noticeable. *Id.* at 759. I have also reviewed facts proffered and arguments submitted by the proponents and opponents of the petition." He then stated all the facts which he had considered in affirming his original decision that the petition does not establish, on its face, that it effects a regulatory taking.[6]

"*Mode of Originating*. Such petition shall first be signed by ten qualified voters of the commonwealth and shall be submitted to the attorney-general not later than the first Wednesday of the August before the assembling of the general court into which it is to be introduced, and if he shall certify that the measure and the title thereof are in proper form for submission to the people, and that the measure is not, either affirmatively or negatively, substantially the same as any measure which has been qualified for submission or submitted to the people at either of the two preceding biennial state elections, and that it contains only subjects not excluded from the popular initiative and which are related or which are mutually dependent, it may then be filed with the secretary of the commonwealth."

[5] The parties filed supplemental briefs with the full court on or before August 3, 1988.

[6] The Attorney General's summary of the facts was as follows: "Yankee Atomic Electric Company (Yankee) and Boston Edison Company (Boston Edison) own and operate the only two commercial nuclear reactors in the

In assessing the Attorney General's conclusion that, on consideration of the pertinent facts, the petition does not, on its face, establish a regulatory taking, we undertake de novo review. *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 230 n.18 (1981). See, e.g., *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 248-253 (1946) (court engages in de novo review in considering whether petition contains excluded matter); *Horton* v. *Attorney Gen.*, 269 Mass. 503, 511-512 (1929) (same). Similarly, in considering what facts are implicit in the petition's language or are subject to judicial notice, see *Yankee One, supra* at 759 & n.7, we are not bound by the Attorney General's determinations. However, in assessing the extent of the facts subject to his official notice, see *id.*, we will defer to the Attorney General's reasonable determinations. See *Massachusetts Teachers Ass'n, supra* at 230. Cf. *Beth Israel Hosp. Ass'n* v. *Board of Registration in Medicine*, 401 Mass. 172, 176 (1987) ("all presumptions are in favor of the validity of agency action . . . [and] agencies have leeway in interpreting statutes they enforce").

---

Commonwealth. Yankee's plant is located in Rowe, Massachusetts. Boston Edison's plant is located in Plymouth, Massachusetts. According to the company and local real estate records, Yankee's plant is situated on approximately 2,200 acres of land in Rowe.

"Yankee and Boston Edison operate their plants under licenses granted to them by the United States government. Yankee's license to operate the plant in Rowe was issued by the Atomic Energy Commission in 1957. Boston Edison's license to operate the plant in Plymouth was issued in 1972 by the Atomic Energy Commission. The terms of the licenses include, inter alia, the period of time for which they are issued. Federal law establishes requirements for the operation of the plants. Yankee and Boston Edison invested money to build the plants, and the companies sell or have sold electricity generated by the plants. Contracts for the sale of this electricity are subject to review by appropriate regulatory agencies.

"The petition does not, either facially or implicitly, exercise the power of eminent domain or mandate a physical taking or invasion of private property. The apparent impact of the petition, however, would be to prohibit after July 4, 1989, the generation of electricity by these two reactors 'by means which result in the production of nuclear waste.' I infer from this prohibition that it would prevent Yankee and Boston Edison from generating any electricity by use of their nuclear reactors in their current forms after July 4, 1989."

Guided by our description in *Yankee One* of the limited factual examination required of the Attorney General, we first consider whether there are facts implicit in the petition's language or facts subject to judicial notice, i.e., indisputable facts or matters of common knowledge, which the Attorney General should have considered and did not. In our view there are no such facts. The Attorney General's summary of the facts he considered, *supra* note 6, contains all the facts which we would consider to be implicit in the petition's language and subject to judicial notice.

Next we determine whether there are further facts of which, in accordance with our directions to him in *Yankee One*, *supra* at 759 & n.7, the Attorney General should have taken official notice "due to [his] established familiarity with and expertise regarding a particular subject area." Beyond question, the person best qualified to determine the extent of his expert knowledge is the Attorney General. In that regard we shall not lightly substitute our view of what are the officially noticeable facts for that of the Attorney General. See *Massachusetts Teachers Ass'n*, *supra* at 230. Cf. *Beth Israel Hosp. Ass'n*, *supra*, and cases cited. Our review of the summary of the facts he considered, *supra* note 6, leads us to conclude that the Attorney General did not arbitrarily omit facts apparently subject to his official notice. Accordingly, we accept as *reasonable* the Attorney General's determination of the facts he has considered in affirming his certification of the petition.

We next consider whether the facts recognized by the Attorney General preclude him under art. 48, as a matter of law, from certifying the petition. Here we look particularly at the Attorney General's finding that "I infer from [the petition's] prohibition that it would prevent Yankee and Boston Edison from generating any electricity by use of their nuclear reactors in their current forms after July 4, 1989." *Supra* note 6. Do the facts as properly found compel a conclusion that this petition proposes legislation which would bring about a taking of private property without compensation? We think not, and in so concluding we look to the legal principles which have controlled in cases similar to the case before us.

Our review of these principles reveals issues (1) which are relevant to the question whether a taking would ensue from the proposed legislation, and (2) which have not been, and should not be, determined through the Attorney General's limited examination of the facts at this time. The petition proposes not a permanent physical occupation or confiscation of property, see *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), but instead a regulation of use of property. As such the question is whether the "regulation goes too far." *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 415 (1922). Answering this question involves regulatory takings analysis which is peculiarly fact dependent, involving "essentially ad hoc, factual inquiries." *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 124 (1978). See *Turnpike Realty Co.* v. *Dedham*, 362 Mass. 221, 236 (1972), cert. denied, 409 U.S. 1108 (1973). We conclude that at least some of the relevant inquiries which may arise in the ultimate determination whether a taking of property has occurred will involve the kind of lengthy factual determinations which art. 48 does not require or allow to the Attorney General at this time.

In his letter of July 19, 1988, to the Secretary of the Commonwealth, affirming his certification, the Attorney General describes a number of these factual inquiries, and asserts that they are relevant to the regulatory takings analysis.[7] We think

---

[7] The Attorney General wrote as follows: "Nothing in the petition, however, restricts alternative uses of the property that might be affected by the petition. The proponents and opponents of the petition dispute the possible alternative uses of the affected property. For example, the proponents assert that the property could be converted to another power source, used for a low-level waste repository, or used for other commercial purposes. The opponents dispute the availability of these proposed alternative uses. In my view, these issues of 'residual use' present questions of fact beyond the scope of my review. Certain of the disputed residual uses implicate future regulatory proceedings, such as licensing proceedings, the outcomes of which are not determinable at this time. In such circumstances I cannot conclude that the petition is 'inconsistent' with the asserted 'right to receive compensation for private property appropriated to public use' simply because one use of the property of the companies is foreclosed.

"Similarly, the actual values of the Yankee and Boston Edison properties before and after the effective date of the petition are not facts susceptible to official notice. Resolution of such questions would require me to decide,

that this assertion is well made in that the existence of the undetermined factual issues raised, *supra* note 7, leads to reasonable, not frivolous, contentions that the petition does not necessarily effect a regulatory taking. This is so because the presently undetermined factual issues pointed to by the Attorney General have been held to be relevant to regulatory takings analysis. Thus, the issue of residual use is relevant, see, e.g., *Penn Cent. Transp. Co.*, *supra* at 131; *MacNeil* v. *Avon*, 386 Mass. 339, 341 (1982); *Lovequist* v. *Conservation Comm'n of Dennis*, 379 Mass. 7, 10 (1979), as is the determination of the diminution in value of the regulated property. See *Goldblatt* v. *Hempstead*, 369 U.S. 590, 594 (1962). See also *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915) (no regulatory taking despite substantial diminution in value); *Turnpike Realty Co.*, *supra* (same).

The possibility of compensation through the rate setting process cited by the Attorney General affects the "takings" analysis in this case in a manner similar to the possibility that an appropriate board might grant a special permit affects the takings analysis in a case where a zoning by-law is challenged. See *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 641 (1970). In both instances the determination whether a taking is present depends, in part, on a factual inquiry regarding possible agency action. The possibility of compensation through the rate setting process also has an impact on the question of the degree of interference with investment-backed expectations caused by the petition. See *Penn Central*, *supra* at 124.

In sum, the facts implicit in the petition's language taken with those susceptible to the Attorney General's official notice

---

among other things, disputable facts such as the actual net values of the properties before and after the effective date of the petition, and the extent to which the plants' owners may be permitted to recover their investments in the idled plants through existing regulatory processes. There are subsidiary facts, relevant to the actual values of the plants, that are indisputable. For example, I have taken official notice of past real estate tax assessments of the Yankee property by the Town of Rowe. However, the values of the properties in question remain ultimate facts not subject to official notice."

do not establish that the petition effects a regulatory taking.[8] In this circumstance, it was reasonable and proper for the Attorney General to affirm the petition's certification. This result is consistent with the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws. See *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 199, 202-203 (1976); 2 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 728 (1918) (when certifying petitions as to proper form, Attorney General is not to be a censor; people should be allowed to speak and act freely through the initiative process). In reaching this result we are, of course, not reaching or impliedly commenting as to the wisdom of the proposed legislation.

We affirm the Attorney General's certification of the initiative petition. The certification was valid ab initio. The Secretary of the Commonwealth shall take the appropriate steps to have

---

[8] The plaintiffs' argument that, on the facts as established by the Attorney General, the petition effects a regulatory taking improperly divides the utilities' property into discrete segments and focuses on the petition's impact on one of these segments (the reactor) rather than considering the petition's interference with the utilities' property rights as to the affected sites as a whole. See *Keystone Bituminous Coal Ass'n* v. *DeBenedictis*, 480 U.S. 470, 495-498 (1987). Further, even if such dissection of the utilities' property is appropriate, possible other uses of the reactor (e.g., nuclear waste storage site), and the possibility of compensation through the rate setting process of the cost of conversion from nuclear to fossil fuel generation of electricity, or for the loss of generating capacity, indicates that the plaintiffs' argument is not determinative.

the measure placed on the ballot in the upcoming State elections.[9] Rescript is to enter forthwith.[10]

*So ordered.*

LYNCH, J. (dissenting, with whom Liacos, J., joins). It has long been recognized that a governmental taking of property may be accomplished without the formal apparatus of eminent domain; a taking may result from a government regulation in a particular area. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315-316 (1987). This type of taking has been referred to as a "regulatory" taking or "inverse condemnation." As noted by Justice Stevens, "However confusing some of our criminal procedure cases may be, I do not believe they have been as open-ended and standardless as our regulatory takings cases are." *Id.* at 340 n.17 (Stevens, J., dissenting). Be that as it may, certain overarching precepts may be identified.

Any discussion of the law of regulatory takings must begin with the landmark case of *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922). At issue in *Mahon* was the validity of a Pennsylvania statute "forbid[ding] the mining of anthracite coal in such way as to cause the subsidence of, among other

[9] Should the measure be adopted by the people, the plaintiffs are free to pursue, in appropriate fashion, any and all challenges, aside from those decided in this proceeding, they may have to the petition's validity. See *Bowe v. Secretary of the Commonwealth*, *supra* at 243-248; *Horton v. Attorney Gen.*, *supra* at 513-515. In ruling that the Attorney General's certification of the petition was proper, we do not preclude a determination, on appropriate proof and following the necessary factual resolutions, that the petition effects a regulatory taking as applied to particular property. We merely hold that, on the limited findings of fact permitted to the Attorney General at this time, the petition does not necessarily involve such a taking.

[10] Two Justices of the court found it necessary to recuse themselves from participating, and thus this matter was left to five Justices for decision. Although only three of the Justices concur in the result *supra*, the full panel is in agreement that judgment shall enter as above. See G. L. c. 211, § 2 (1986 ed.) ("four justices . . . constitute a quorum to decide all matters required to be heard by [the court]"). See also *Commonwealth v. Geraway*, 364 Mass. 168, 186 (1973) (decision of three Justices disposes of case).

things, any structure used as a human habitation, with certain exceptions . . . ." *Id.* at 412-413. It was admitted that the statute acted to destroy the coal company's previously existing right to mine the coal beneath the affected structures notwithstanding any subsidence, but, the plaintiffs contended, the statute was nonetheless valid as a legitimate exercise of the State's police power, for which no compensation need be provided. *Id.* at 413. The Court, speaking through Justice Holmes, disagreed, and in its opinion set out what have become the bedrock principles of regulatory takings law.

First, the Court noted, not every government action is a taking merely because the action incidentally diminishes property values. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power." *Id.* at 413. However, the Court recognized, that implied limitation is itself subject to limits, "or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power." *Id.* Thus the Court advocated a kind of ad hoc balancing of the public interest served as against the private interest harmed.

In determining that "the legislature [had] gone beyond its constitutional power," the Court reasoned that any public interest to be served by the statute was slight. The Court recognized that the Act was not justified as a protection of public safety since that "could be provided for by notice" to the surface landowner. *Id.* at 414. Rather, the Court considered the Act to be a species of economic regulation, designed to shift the cost of the surface owners' misfortunes onto the shoulders of the coal company. See *id.* at 416.

On the other hand, the Court calculated the private detriment to be great: " 'For practical purposes, the right to coal consists in the right to mine it.' *Commonwealth* v. *Clearview Coal Co.*, 256 Pa. St. 328, 331. What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it." *Id.* at 415. In the words of a Massachusetts case, the Act deprived the coal company's property of "all practical value." *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 641 (1970).

Later Supreme Court cases have expanded upon the *Mahon* formulation and, in so doing, have identified three factors which are of particular significance to the regulatory taking question: (1) the economic impact of the regulation; (2) its interference with reasonable investment-based expectations; and (3) the character of the governmental action. E.g., *Keystone Bituminous Coal Ass'n* v. *DeBenedictis*, 480 U.S. 470, 493-495 (1987); *Ruckleshaus* v. *Monsanto Corp.*, 467 U.S. 986, 1005 (1984); *Kaiser Aetna* v. *United States*, 444 U.S. 164, 175 (1979). See *Nassr* v. *Commonwealth*, 394 Mass. 767, 770 (1985).

The court relies on the recent case of *Keystone Bituminous Coal Ass'n* v. *DeBenedictis*, 480 U.S. 470 (1987), to explicate the question of when a regulation goes too far. I believe that the *Keystone* decision has no application to the matter in question.

In *Keystone*, the plaintiffs challenged the constitutionality of a statute superficially similar to that challenged in *Mahon*. The Pennsylvania statute, known as the Bituminous Mine Subsidence and Land Conservation Act, required coal companies to keep in the ground at least 50% of the coal beneath defined structures to protect those structures from subsidence damage. The coal companies in a facial attack on the statute sought to enjoin its enforcement alleging that it violated the takings clause of the Fifth Amendment. The companies neither alleged nor proved any specific injury; rather, they contended that the mere

enactment of the statute constituted a taking. The Supreme Court concluded that the companies had not proven a taking.

The *Keystone* Court did not repudiate the principles of *Mahon*. Indeed the Court affirmed that "[t]he two factors that the [*Mahon*] Court considered relevant" — that is, the nature and extent of the public interest versus the nature and extent of the private harm — "have become integral parts of our takings analysis." *Id.* at 485.

However, the Court considered the Subsidence Act analogous to a State's "exercising its police power to abate activity akin to a public nuisance." *Id.* at 488. There is nothing remarkable or that in any way diminishes traditional taking concepts by recognizing the equally established concept that a property owner cannot use his property in such a way as to constitute a public nuisance. Furthermore, the court concluded the Subsidence Act did not render mining of coal "commercially impracticable." *Id.* at 493. Thus *Keystone* affirms the fundamental principles of *Pennsylvania Coal Co.* v. *Mahon* and its progeny, that any economic regulation that renders the existing use of the owners' property commercially impractical and contrary to reasonable investment-backed expectations constitutes a taking. Applying this test, I conclude that the petition would effect an unconstitutional taking of property without just compensation and, therefore, the petition may not be certified.

It is undisputed that the effect of the petition is to shut down Yankee's operations: Section 2 of the petition prohibits generation of electricity by means which result in the production of nuclear waste at commercial electric nuclear power plants on or after July 4, 1989. We take judicial notice of the fact that, in the current state of the art, it is impossible to produce electricity by nuclear fission without producing nuclear waste. Finally, it is public record that Yankee's license does not expire until 1997.[1]

---

[1] It has been held that a license to operate a business is a protected property interest under the due process clause if it cannot be taken away from its holder before a time certain and in the absence of misconduct. *Baer* v. *Wauwatosa*, 716 F.2d 1117, 1122 (7th Cir. 1983). Thus, the petition at issue here might also be analyzed as effecting a taking of Yankee's license,

The economic impact of the regulation is catastrophic. Obviously it renders the production of nuclear power — Yankee's reason for being in business — "commercially impracticable." Furthermore, it converts an economically viable enterprise into an economic albatross. In testimony filed before the Nuclear Regulatory Commission, the Attorney General stated that, after a plant is irradiated "[b]oth the plant and plant site become nearly irreversibly committed to a nuclear facility. This is because much of the plant equipment will be made radioactive and because the site itself becomes (de-facto) a long-term radioactive waste storage facility since there is no approved storage facility available to receive the irradiated fuel." Thus the Attorney General himself has conceded that an irradiated but inoperative nuclear power plant is nothing more than nuclear *waste*. Cf. *Commissioner of Natural Resources* v. *S. Volpe & Co.*, 349 Mass. 104, 110-111 (1965) (court unable to tell from record whether all uses of land had been eliminated by regulation). We also take notice of the fact that after the plant ceases production Yankee will be left with the burden of decommissioning it. Atomic Energy Commission Reg. Guide 1.86; 50 Fed. Reg. 28,5600 (1985) (to be codified at 10 C.F.R. §§ 30, 40, 50, 51, 70 & 72) (burden of decommissioning); G. L. c. 233, § 70 (1986 ed.) (Federal law is judicially noticeable); 44 U.S.C. § 2507 (1982 ed.) (contents of Federal Register shall be judicially noticed). Thus, this is a classic case of a regulation leaving a landowner with only the burdens of ownership and none of the benefits. See *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 641 (1970).[2]

since the effect of the petition is to terminate Yankee's business before that license expires. Compare *Boston Elevated Ry.* v. *Commonwealth*, 310 Mass. 528 (1942) (legislative termination of franchise *in accordance with condition of grant for breach of the condition* cannot be regarded as a taking).

[2] The mere fact that a portion of Yankee's property is affected may, despite the defendants' assertions, indicate a taking. For while the United States Supreme Court has intimated that various parts of property are not to be "segmented" to determine whether there has been a taking, *Keystone* at 500-501, that interpretation of the Fifth Amendment of the Federal Constitution is not necessarily applicable to article 10 of the Declaration of Rights, which states that "no *part* of the property of any individual can,

This is not a case of the government's "freezing" a property into its existing use or prohibiting contemplated future uses not based upon reasonable investment-backed expectations. See *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 138 (1978). On the contrary, the petition at issue here would eliminate altogether the existing primary use of Yankee's property. Compare *Penn Cent.* with *Pennsylvania Coal Co.* v. *Mahon, supra.*

The government's police power, however, depends to great extent on the *nature* of the government action. Thus, what was considered a taking in *Mahon* was deemed a valid police power regulation in *Keystone* because of a crucial difference in the nature of the government action. That is, in *Mahon*, the government action "served only private interests," while in *Keystone* the government action was justified by health and safety concerns. *Keystone, supra* at 484. Similarly, in cases such as *Mugler* v. *Kansas*, 123 U.S. 623 (1887) (prohibiting manufacture of liquor); *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915) (prohibiting operation of brickyard in residential area); and *Goldblatt* v. *Hempstead*, 369 U.S. 590 (1962) (prohibiting excavation for sand and gravel below water line), the government may prohibit "noxious use of property" in the interest of public health and safety. *Penn Central, supra* at 145 (Rehnquist, J., dissenting).

Here, the basis for the governmental action is stated to be that it is "uneconomical and unwise to continue to generate electric power in the Commonwealth by means which result in the production of nuclear waste when there is no method for disposal of nuclear waste. The purpose of this Act is to protect the people of Massachusetts from the consequences of this uneconomical and unwise course . . . ." Thus, by its own terms, the petition seeks not to abate any public nuisance, but only to shelter the public from what its signers see as an economically unwise method of producing electricity.[3]

with justice, be taken from him, or applied to public uses, without his consent, or that of the representative body of the people" (emphasis added).

[3] While we have upheld public regulations *preserving* existing uses, see *Opinion of the Justices*, 333 Mass. 773 (1955); *Opinion of the Justices*, 333

Moreover, we must recognize that use of the property which is restricted by the statutes is one that is authorized by a Federal permit and thus calls into question the preemption doctrine. The Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 et seq., gives the Federal government exclusive control over radiological safety issues involved in the construction and operation of nuclear power plants. *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190 (1983). Force of logic compels the conclusion that nuclear power, which is both permitted and extensively regulated by the government, cannot constitute a public nuisance.

The signers of the petition seek to impose upon two power companies and their ratepayers the cost of eliminating what the signers perceive to be an "uneconomical" means of producing power. Leaving aside the question of the extent to which it is the proper function of government to close down "uneconomical" businesses, this petition impermissibly seeks to impose upon two power companies and their ratepayers the transaction cost of shifting from an assertedly less economical means of producing power to some more economical means.[4] It is a fundamental tenet that government may not single out a few citizens to bear burdens properly borne by the public as a whole. See *Armstrong* v. *United States*, 364 U.S. 40, 49 (1960); *Pennsylvania Coal Co.* v. *Mahon, supra* at 416.[5]

In sum, if enacted, the petition would render production of nuclear power at Yankee's plant commercially impossible,

Mass. 773 (1955); *Opinion of the Justices*, 333 Mass. 783 (1955), we are aware of no case in which such a purpose was sufficient to *eliminate* the primary existing use of an individual's property.

[4] The petition does not address the economic cost of "acid rain" and the "greenhouse effect," which is an environmental cost of producing electrical power by the conventional means of burning fossil fuel.

[5] Thus, the instant case is to be distinguished from *Miller* v. *Schoene*, 276 U.S. 272 (1928), where landowners were required to cut down their cedar trees in order to prevent a blight on the State's apple crop, an emergency measure necessary to preserve this important agricultural activity. No emergency is present here. Cf. *Davidson* v. *Commonwealth*, 8 Mass. App. Ct. 541, 549 (1979) (no taking where government took over operation of nursing home in emergency situation).

thus upsetting Yankee's reasonable expectation that, on the basis of its Federal license, it could continue to operate as a nuclear power plant until 1997. The petition, if enacted, would eliminate all commercial use of the property and convert an economic use to an economic burden on the owners. Hence, the Attorney General could not properly certify that the petition contained no excluded matter.[6] I therefore respectfully dissent.

---

[6] The Attorney General strenuously argues that the factual record is insufficient to establish a taking, and, therefore, that he may certify that the petition contains no excluded matter. Even were we to accept the Attorney General's premise, his conclusion does not necessarily follow. The United States Supreme Court has expressed its hesitancy to address takings claims on less than a fully developed record. *Pennell* v. *San Jose*, 485 U.S. 1, 8-9 (1988). However, the justification for that Court's hesitancy was an unwillingness to reach constitutional claims unnecessarily. Here, on the other hand, it is the express constitutional function of the Attorney General to examine the constitutional issues presented by an initiative petition to ensure that the rights of the individual under our State Constitution are adequately protected from majoritarian encroachment. Article 48 admonishes that the Attorney General "shall certify" that the petition contains no excluded matter. As we noted in *Yankee One*, the word "certify" in art. 48 means "to make certain, as a fact; to attest authoritatively; to verify. . . ." *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 402 Mass. 750, 757 (1988). That language would seem to indicate that if there is any reasonable possibility that the petition impinges on an excluded matter, it may not be certified. Thus the fact that a petition leaves open certain fact questions cannot justify the Attorney General in abdicating his constitutional function as gatekeeper against an initiative's potential infringement upon important individual rights. Where the petition, read in light of both its apparent factual impact and officially noticeable facts, discloses a reasonable possibility that the petition contains an excluded matter, it is the Attorney General's constitutional duty to deny certification.