RICHARD DIMINO & others[1] *vs.* SECRETARY OF THE
COMMONWEALTH & another.[2]

Suffolk. April 10, 1998. - June 23, 1998.

Present: LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Moot Question. Practice, Civil,* Moot case. *Evidence,* Judicial notice.
*Constitutional Law,* Initiative petition, Eminent domain. *Initiative. Attorney
General. Massachusetts Turnpike Authority. Bond,* Construction contract
bond, Public works. *Contract,* Bond. *Eminent Domain,* What constitutes
taking.

A claim that the Attorney General had erroneously certified that a citizen's
initiative petition to eliminate toll collections on certain roadways did not
concern matters "excluded" from the initiative process under art. 48, The
Initiative, Part II, § 3, of the Amendments to the Constitution of the Com-
monwealth was not moot, where plaintiffs' interests secured by $1.7 billion
in the Massachusetts Turnpike Authority's 1997 bond issue were outstand-
ing and where, in any event, there was strong public interest in the pos-
sibility of subjecting the Commonwealth to liability for such an amount.
[707-708]

A citizen's initiative petition to eliminate toll collections on certain roadways
proposed an appropriation of the private property of persons who had
purchased bonds issued by the Massachusetts Turnpike Authority which
were secured by toll revenues [708-710], and the petition's appropriation
of the bondholders' security was "inconsistent with . . . the right to
receive compensation" under art. 48, The Initiative, Part II, § 3, of the
Amendments to the Constitution of the Commonwealth, where the
petition's provision for compensating the bondholders was inadequate
[710-711]: as such the petition contained a matter excluded from the initia-
tive process by art. 48 and the Attorney General's certification of the initia-
tive was improper [711].

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on December 18, 1997.

The case was reported by *Fried,* J.

*E. Randolph Tucker (Timothy Veeser* with him) for the
plaintiffs.

---

[1]More than nine other qualified voters of the Commonwealth; Artery Busi-
ness Committee, Inc.; and Construction Industries of Massachusetts, Inc.

[2]Attorney General of the Commonwealth.

*Douglas H. Wilkins*, Assistant Attorney General (*Peter Sacks*, Assistant Attorney General, with him) for Secretary of the Commonwealth & another.

LYNCH, J. The plaintiffs initiated this action seeking a declaratory judgment and an order in the nature of mandamus in the Supreme Judicial Court for Suffolk County. They contend that the Attorney General erred in certifying that a citizens' initiative petition to eliminate toll collections on certain Massachusetts roads did not concern matters "excluded" from the initiative process under art. 48, The Initiative, Part II, § 3, of the Amendments to the Constitution of the Commonwealth. A single justice of this court reserved decision and reported the case for consideration by the full court. We agree with the plaintiffs' claim and accordingly declare that the petition contains matters excluded from the initiative process under art. 48.

*Facts.* The parties agree on the following facts: The Massachusetts Turnpike Authority (authority), established in 1952, is "a body politic and corporate" within the State Executive Office of Transportation and Construction, and is charged with the construction, maintenance, and over-all management of the Massachusetts Turnpike and a series of other roads collectively now known as the metropolitan highway system. The Massachusetts Turnpike is an express toll highway beginning at the New York border in the town of West Stockbridge and ending at the interchange of Interstate 90 and State Highway Route 128 (also known as Interstate 95) in the town of Weston. The metropolitan highway system consists of the Boston Extension of the Massachusetts Turnpike, Sumner Tunnel, Callahan Tunnel, Ted Williams Tunnel, the Central Artery, and the Central Artery north area. General Laws c. 81A (the enabling act), amended by St. 1997, c. 3, § 6, repealed earlier enabling acts, and authorizes the authority to issue bonds to pay costs relating to its general management responsibilities, and to repay the authority's debts or obligations. See G. L. c. 81A, § 5. It also authorizes the authority to charge and to collect tolls for transit over the turnpike and metropolitan highway system in order to generate revenues for the authority. See G. L. c. 81A, §§ 4, 10.

Pursuant to its powers under the enabling act, the authority in 1993 issued a series of turnpike revenue bonds in the amount of $365,555,000 to finance turnpike construction and various capital improvements. The 1993 bonds were issued pursuant to, and are governed by, the terms of a trust agreement between the

authority and the 1993 bondholders. This agreement defines the collateral for the 1993 bonds and the authority's obligations to the bondholders. Subsequently, in October, 1997, the authority again issued a series of bonds totaling more than $1.7 billion. This included $1,466,862,622.85 of metropolitan highway system bonds and $297,520,000 of western turnpike revenue bonds. Like the 1993 bonds, the 1997 bonds were issued pursuant to two trust agreements between the authority and the 1997 bondholders, one governing the metropolitan highway system bonds, and the other governing the western turnpike revenue bonds. Each of these agreements delineates the collateral for, and the authority's obligations with respect to, the 1997 bonds. The authority then used the proceeds from the 1997 issuance to retire all outstanding debts from the 1993 bonds. The 1997 bonds, however, remain outstanding.

On or before August 6, 1997, a petition entitled "An Act By Citizens Initiative To Roll Back And Then Prohibit Tolls On The Turnpike, The Boston Extension, The Metropolitan Highway System, The Tobin Bridge, The Sumner, Callahan, And Ted Williams Tunnels, And On Any Other Road, Highway, Tunnel, Or Bridge In The Commonwealth To Which The Public Has Motor Vehicle Access," reproduced in the Appendix to this opinion, was filed with the Attorney General. In essence, the petition seeks to amend the enabling act such that (1) as of January 1, 1999, toll rates would be reduced to their June 1, 1997, levels; and (2) as of August 15, 1999, toll collection would be completely eliminated. The Attorney General, in a letter dated September 3, 1997, certified, inter alia, that the petition contained "only subjects . . . that are not excluded from the initiative process pursuant to Article 48, the Initiative, Part 2, Section 2."

The plaintiffs thereafter objected, claiming that the Attorney General's certification was erroneous in that the petition concerns two subjects "excluded" from the initiative process by art. 48. They first claim that because the petition, if enacted, would eliminate part of the 1997 bondholders' security interest (i.e., toll revenue), it offends art. 48's prohibition of initiatives which are "inconsistent with the right to receive compensation for private property appropriated to public use." They alternatively contend that, because the petition as enacted would affect the authority almost exclusively, art. 48's ban of initiatives whose operation "is restricted to a particular . . . political

subdivision" would be violated. Because we agree with the plaintiffs' first contention, we decline to address the latter.

1. *Mootness.* As a preliminary matter, the defendants maintain that the plaintiffs' claim is moot because the 1993 bonds have been repaid. This repayment, according to the defendants, eliminated any security interest which the 1993 bondholders may have once held in the authority's toll revenues. The absence of this security interest, the defendants contend, precludes the plaintiffs from claiming at this time that the petition, if enacted, would constitute an appropriation of private property "inconsistent with the right to receive compensation."

The defendants' argument in this regard presupposes that, in making his determination, the Attorney General properly disregarded any security interest held by the 1997 bondholders. It is with this presumption that we take issue. This court reviews de novo the Attorney General's certification that a petition does not contain an excluded matter under art. 48. *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 403 Mass. 203, 207 (1988) (*Yankee II*). In doing so, "[w]e consider anew what facts are implicit in the language of the petition or are subject to judicial notice, but we defer to the Attorney General's reasonable determinations concerning facts subject to his official notice." *Associated Indus. of Mass.* v. *Attorney Gen.*, 418 Mass. 279, 286 (1994). "Factual matters which are 'indisputably true' are subject to judicial notice; these include '[m]atters of common knowledge or observation within the community.'" *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 402 Mass. 750, 759 n.7 (1988) (*Yankee I*), quoting *Nantucket* v. *Beinecke*, 379 Mass. 345, 352 (1979).

In the present case, we conclude that, in certifying the petition, the Attorney General should have considered the security interest held by the 1997 bondholders. The existence of the 1997 bonds and the 1997 bondholders' security interest is, in our view, "indisputably true," given that the proceeds from these bonds alone made the retirement or repayment of the 1993 bonds possible. Official Statements of the Massachusetts Turnpike Authority, 1997 Bonds. Moreover, the issuance of $1.7 billion worth of authority bonds, by virtue of its sheer magnitude, is a matter of "common knowledge or observation." As such, the existence of the 1997 bonds and their corresponding security interest is a judicially noticeable fact which the Attorney General erred in disregarding during the certification process. *Yankee I, supra* at 759 n.7.

Therefore, in reviewing his decision that the petition was not "inconsistent with . . . the right to receive compensation for private property appropriated for public use," we shall consider whether the petition would, if enacted, effect a taking of the security interest held by 1997 bondholders. *Associated Indus. of Mass.* v. *Attorney Gen., supra.* Because this interest and the bonds which secure it are still outstanding, the plaintiffs' claim is not moot.

Furthermore, even if moot, the plaintiffs' claim would require our consideration. We make an exception to the general rule against hearing moot claims in some cases "because of the public interest involved and the uncertainty and confusion that exist." *Metros* v. *Secretary of the Commonwealth,* 396 Mass. 156, 159 (1985), citing *Wellesley College* v. *Attorney Gen.,* 313 Mass. 722, 731 (1943). Unquestionably, the potentially erroneous certification of an initiative petition which, if enacted, may subject the Commonwealth to well over a billion dollars in liability, is a matter of public interest. See *Newspapers of New England, Inc.* v. *Clerk-Magistrate of the Ware Div. of the Dist. Court Dep't,* 403 Mass. 628, 629 n.4 (1988), cert. denied, 490 U.S. 1066 (1989) (although case involving newspaper's claim of entitlement to impounded court records was "clearly moot," court would address merits "because of the strong public interest in the matter").[3]

2. *The appropriation of private property.* We next consider whether, based on the petition's potential effect on the security interest of the 1997 bondholders, the Attorney General erred in certifying that the petition was not "inconsistent with . . . [t]he right to receive compensation for private property appropriated to public use." Art. 48, The Initiative, Part II, § 2. See *Yankee II, supra* at 208; *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 248-253 (1946).

To do so, we must first determine whether the petition's proposed elimination of toll revenue constitutes an appropriation of the bondholders' private property. The parties agree that the bondholders' rights to the authority's revenue under the trust agreements are "property" protected by art. 10 of the Mas-

[3]We note also the plaintiffs' petition, if enacted, would also affect the bonds previously issued by the Massachusetts Port Authority (port authority), which were still outstanding at the time of the Attorney General's certification. The port authority is charged with managing a toll facility known as the Tobin Memorial Bridge, which is subject to the petition.

sachusetts Declaration of Rights and by the takings clause of the Fourteenth Amendment to the United States Constitution. See *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 19 n.16 (1977); *Boston Elevated Ry.* v. *Commonwealth*, 310 Mass. 528, 555 (1942). The petition's elimination of toll revenue constitutes a full-blown appropriation of the bondholders' right to that property. The Justices have previously opined that a proposed toll freeze deprives bondholders of their security interest in toll revenues — an interest which was expressly bestowed on them by contract — and therefore would violate their constitutional rights. *Opinion of the Justices*, 356 Mass. 775, 793-794 (1969).[4] In such circumstances, the Justices opined, the toll freeze was "a direct legislative repudiation of an arrangement which [the enabling act] empowered the [Massachusetts Turnpike] Authority to make, going to the essence of the bond contract and materially reducing the attractiveness of the revenue security." *Id.* at 794. Cf. *Opinion of the Justices*, 365 Mass. 665, 677 (1974) (enactment increasing taxation of Massachusetts Port Authority did not unconstitutionally harm bondholders where "no express provision of the bondholders' contract would be affected by [the increase]").

In the present case the 1997 trust agreements explicitly provide that the bonds are to be secured, in part, by the "revenues" generated by the authority. See §§ 201, 501 of the trust agreements. These "revenues," in turn, come from toll collection almost exclusively.[5] Both the enabling act and the trust agreements, moreover, require the authority to collect tolls sufficient to cover the authority's debt obligations. See § 610 of

[4]Specifically, the Justices opined that the proposed toll freeze would unconstitutionally impair the contract between the authority and its bondholders. For purposes of the present case, we note that the Justices' analyses under the contracts clause and the due process clause of the Fourteenth Amendment "amount[] to much the same thing." *Opinion of the Justices*, 364 Mass. 847, 863 (1973). See *Massachusetts Port Auth.* v. *Treasurer & Receiver Gen.*, 352 Mass. 755, 763 (1967).

[5]In 1996, for example, the authority's total operating revenues were $169,693,137. Of this amount, $157,680,842 was generated by toll collection. Only $12,012,295, therefore, were nontoll revenues. See Massachusetts Turnpike Authority 1996 Annual Report at 14. Even so, the defendants argue that, because some nontoll revenue exists, the elimination of toll collection alone does not effect an appropriation of the bondholders' security interest in the authority's "revenues." That the authority does not rely solely on toll collection for its "revenues" does not alter our analysis. Appropriating a portion of property, especially a significant portion, is nonetheless an appropriation

the trust agreements; G. L. c. 81A, §§ 10 (*a*)-(*b*) (authorizing authority to charge and to collect tolls "to pay . . . the principal of, redemption premium, if any, and the interest on notes or bonds relating to" turnpike and metropolitan highway system). In these circumstances the petition's proposed abolishment of toll collection strikes at the very heart of the express provisions of trust agreements which the Legislature authorized. *Opinion of the Justices*, 356 Mass. at 794. Furthermore, logic compels the conclusion that, if a toll freeze unconstitutionally deprived the bondholders of their security interest, the elimination of all tolls must do the same. See *id.* We consequently conclude that, for purposes of art. 48, the petition constitutes an appropriation of the bondholders' private property.

3. *The right to receive compensation.* Having reached this conclusion, we must next decide whether the petition's appropriation of the bondholders' security interest is "inconsistent with . . . [t]he right to receive compensation" under art. 48, The Initiative, Part II, § 2. This court has long held that "[t]he duty of paying an adequate compensation, for private property taken, is inseparable from the exercise of the right of eminent domain." *Bromfield* v. *Treasurer & Receiver Gen.*, 390 Mass. 665, 668 (1983), quoting *Haverhill Bridge Proprietors* v. *County Comm'rs of Essex*, 103 Mass. 120, 124 (1869). See *Attorney Gen.* v. *Old Colony R.R.*, 160 Mass. 62, 90 (1893), quoting *Drury* v. *Midland R.R.*, 127 Mass. 571, 576 (1879) ("The power to take and the obligation to indemnify for the taking are inseparable"). As such, "[t]he act of granting the power must provide for compensation, and a ready means of ascertaining the amount. Payment need not precede the seizure; but the means for securing indemnity must be such that the owner will be put to no risk or unreasonable delay." *Haverhill Bridge Proprietors* v. *County Comm'rs of Essex, supra.*

In the present case the petition's provision for compensating the bondholders is inadequate. Rather than providing the bondholders with a ready means of compensation, the petition merely states that authorities "shall conduct a study . . . on or before March 31, 1999 in order to determine if compensation need be paid in order to implement this Act in a constitutional

requiring compensation. *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430 (1981).

manner."[6] Only where this study first concludes that compensation is warranted, the petition further provides, would "the people expect that the Legislature would mandate certain economies to be made." See *Glover* v. *Boston*, 14 Gray 282, 288 (1859) (compensation "should not be accomplished by the use of ambiguous or uncertain language"). Because we have decided that the petition accomplishes a taking of the bondholders' security interest, it is not open to question that compensation must be paid in order to implement the proposed act in a constitutional manner. "It is not sufficient for a statute to authorize a taking and then provide a *possibility* of compensation in a later proceeding" (emphasis added). *Opinion of the Justices*, 365 Mass. 681, 691 (1974). In its current form, therefore, the petition subjects the bondholders to a real "risk" of receiving no compensation for their loss. *Haverhill Bridge Proprietors* v. *County Comm'rs of Essex*, *supra* at 124-125. It moreover compels the bondholders " 'to trust to the future justice of the Legislature' to provide the compensation owing [them]." *Bromfield* v. *Treasurer & Receiver Gen.*, *supra* at 669, quoting *Connecticut R.R.* v. *County Comm'rs of Franklin*, 127 Mass. 50, 53 (1879).

In light of the petition's inadequacies in this regard, we declare that its proposed appropriation of the bondholders' security interest is indeed "inconsistent with . . . the right to receive compensation" under art. 48. As such, the petition contains a matter "excluded" from the initiative process by art. 48. For this reason, we remand the case to the county court for entry of judgment declaring that the Attorney General's certification of the initiative was improper.

*So ordered.*

APPENDIX.

"Pursuant to the provisions of Article forty-eight of the Amendments of the Constitution of the Commonwealth of Massachusetts, the undersigned qualified voters of the Commonwealth, being ten in number at least, petition for an initiative law to roll back and then prohibit tolls on the Turnpike, the Boston Extension, the Metropolitan Highway System, the Tobin Bridge, the Sumner, Callahan and Ted Williams Tunnels, and on any other road, highway, tunnel or bridge in the Commonwealth to which the public has motor vehicle access.

---

[6]See Appendix.